**RELIANCE INSURANCE COMPANY**

v.

**\* Mark MOESSNER and Marcia Moessner, Assignees of VE Corporation, Appellants.**

No. 95–1899.

United States Court of Appeals, Third Circuit.

Argued Jan. 30, 1997.

Decided Aug. 5, 1997.

As Amended Aug. 28, 1997.

\* (Amended as per the Clerk's 7/18/96 Order).

John A. MacDonald (argued), Robert E. Frankel, Anderson, Kill & Olick, Martin K. Brigham, Eunice Trevor, Galfand, Berger, Lurie, Brigham, Jacobs, Swan, Jurewicz & Jensen, Philadelphia, PA, for Appellants Mark Moessner and Marcia Moessner, Assignees of VE Corp.

Leslie A. Hayes (argued), T. David Williams, Jr., Connolly, Epstein, Chicco, Foxman Engelmyer & Ewing, Philadelphia, PA, for Appellee Reliance Insurance Co.

James L. Griffith, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for VE Corp.

Thomas W. Brunner, Laura A. Foggan, Lon A. Berk, Mary E. Borja, Wiley, Rein & Fielding, Washington, DC, for Amicus Curiae Insurance Environmental Litigation Association.

Before: BECKER, ROTH, Circuit Judges, and BARRY, District Judge.**

## OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal in an insurance coverage dispute founded on diversity jurisdiction requires us to determine whether a total pollution exclusion endorsement (TPE) became part of a comprehensive general liability (CGL) renewal policy issued by Reliance Insurance Company (Reliance) to Vapor Energy Service and Engineering Corporation (VE). The effect of the TPE would be to immunize Reliance from defending and paying the products liability tort claim brought against VE in federal court by Mark Moessner, who sustained carbon monoxide poisoning as the result of the malfunction of a direct-fired steam generator (vaporator) manufactured and sold by VE to Moessner's employer, Faddis Concrete Products.

The appeal arises out of a declaratory judgment action brought by Reliance against VE which sought to establish that VE's CGL policy did not cover Moessner's claims. In that action, the district court granted summary judgment in favor of Reliance, concluding that, under Pennsylvania law: (1) the TPE unambiguously applied to the carbon monoxide emission; (2) Reliance's failure to obtain approval of the TPE by the Pennsylvania Insurance Commissioner did not render the clause invalid; and (3) the doctrines of reasonable expectations, unilateral mistake, and illusory coverage, invoked by VE, did not bar Reliance from relying on the TPE. Moessner was substituted as appellant after VE filed a bankruptcy petition and assigned to Moessner its rights in the coverage litigation in exchange for his releasing VE from liability and dismissing his products liability lawsuit.

We find no merit in Moessner's contentions that: (1) the policy was ambiguous and should therefore be interpreted in his favor; (2) the TPE was rendered invalid by Reliance's failure to obtain approval by the Insurance Commissioner; and (3) Reliance is precluded from relying on the TPE by the doctrines of unilateral mistake or illusory coverage. We discuss the ambiguity issue at some length and dispose summarily of the latter two contentions, finding them to be patently without merit.

The most important and difficult issues on appeal are: (1) whether VE's status as a sophisticated insured renders the doctrine of the parties' reasonable expectations inapplicable; and (2) whether VE had a reasonable expectation of coverage under the renewal policy because its original policy would have covered Moessner's claim, VE requested coverage for claims arising from the manufacturing of products, and VE was never told that the TPE was being included in the renewal policy. We predict that Pennsylvania would conclude that VE's status as a sophisticated insured does not render the

---

** Honorable Maryanne Trump Barry, United States District Judge for the District of New Jersey, sitting by designation.

doctrine of reasonable expectations inoperative. Moreover, we discern a genuine issue of material fact as to whether VE had a reasonable expectation of coverage for the underlying products liability claims. Accordingly, we will reverse the grant of summary judgment in favor of Reliance and remand for further proceedings.

## I.

### A. The Underlying Litigation

In December 1994 and January 1995, two separate civil actions were filed against VE in which Moessner and Henry Drumheller sought monetary damages after they were overcome by carbon monoxide emitted as a by-product of VE's vaporator.[1] The alleged exposures occurred on separate occasions in February 1993 (during the renewal policy's term), and both complaints stated causes of action based on theories of strict liability, negligence, and loss of consortium. The *Drumheller* complaint, for example, averred that the vaporator was defective and unreasonably dangerous because it, among other things, "allowed unreasonable amounts of carbon monoxide to escape and pollute the area."

### B. The Declaratory Judgment Action

At the time of the accidents described, VE, a wholly owned subsidiary of Golodetz Corporation (Golodetz), was insured under a CGL policy issued by Reliance that provided an effective coverage period from May 1, 1992 until May 1, 1993. This policy was a renewal of an original policy that had been issued to VE effective May 1991.

Pursuant to the renewal policy, VE submitted to Reliance requests for defense and indemnity for the *Moessner* and *Drumheller* claims. Reliance investigated the claims and notified VE that, because of the TPE endorsement in VE's insurance policy, Reliance might have no duty to defend or indemnify VE in either action. Reliance further explained that it would assume the defense of VE in both matters subject to a reservation of rights to deny coverage and to withdraw its defense of VE upon reasonable notice of such decision.

Reliance also filed a declaratory judgment action in the district court, seeking a declaration that it had no duty to defend or indemnify VE with respect to the claims in the *Moessner* and *Drumheller* actions. Reliance alleged that the TPE expressly excluded the underlying disputes from coverage under the policy. In response, VE asserted that the TPE was never intended to apply to the underlying claims and that exclusion of coverage was contrary to the parties' understanding and agreement under the policy. VE also asserted affirmative defenses, claiming, *inter alia*, that the insurance policy was ambiguous and that, as a matter of law, it should be interpreted against Reliance. Finally, VE alleged that Reliance's interpretation of the policy was contrary to the reasonable expectations of the parties.

Both parties moved for summary judgment. The district court granted summary judgment in favor of Reliance and denied VE's motion, holding that the terms of the policy were clear and unambiguous, and that the TPE barred coverage for the *Moessner* and *Drumheller* actions. The court rejected VE's contention that Reliance had included the TPE in the policy without notice to VE, and concluded that VE's status as a sophisticated insured, aided by an insurance broker

---

1. *Drumheller v. Hessian Co. t/a Faddis Concrete Products & Vapor Energy Service & Engineering Corp.*, No. 94–10307 (C.P. Chester filed Dec. 1, 1994) and *Mark Moessner & Marcia Moessner, h/w v. VE Corp. & VE Service & Eng'g Corp.*, No. 95–CV–0032 (E.D. Pa. filed Jan. 11, 1995). The vaporator was used to cure pre-formed concrete products manufactured by Faddis Concrete Products. At the time of the accidents, Moessner was employed by Faddis and Drumheller was performing consulting work on Faddis' premises. The injuries alleged by Drumheller included permanent injury to the head, neck, back, and spine,

and nervous shock. Moessner's alleged injuries included permanent brain and neurological damage, permanent damage to his inner ear, constant headaches, insomnia, sleep apnea, and mental and emotional distress.

In December 1992, VE Corp. was reorganized under the name VE Service and Engineering Corporation. VE is engaged in the business of contracting and selling direct-fired steam generators. Although VE formerly manufactured the generators, it ceased those operations in August 1992.

and outside legal counsel who negotiated the terms of its policy, precluded consideration of VE's reasonable expectations as to the meaning of the policy.

After appealing the district court's judgment, VE filed a bankruptcy petition, and the appeal was stayed. VE settled its dispute with Moessner in an amount equal to the applicable policy limits under the renewal policy by assigning him all of its policy and litigation rights against Reliance in exchange for VE's release from liability and dismissal of the underlying lawsuit.[2]

### C. *The Policies*

The policy at issue is the renewal of VE's first insurance policy issued by Reliance. We turn first to the original policy. In an effort to reduce insurance coverage costs for itself and its subsidiaries and affiliates, Golodetz had put out a bid for a comprehensive insurance program. MLW Services, Inc. (MLW), a New York insurance brokerage firm, won that bid, and in turn sought quotes from Reliance for the Golodetz accounts. Through MLW's agent, Silvana Vlacich, Golodetz specifically requested insurance that would cover claims arising out of losses from the use of the vaporator. Golodetz explained to MLW that the vaporator emitted carbon monoxide as a by-product of its operation. Vlacich conveyed this information to Patrick Ferrell, then an underwriter for Reliance, and Reliance issued to VE CGL Insurance Policy No. WL8496401 with an applicable coverage period from May 1, 1991 to May 1, 1992.

The policy was a standard CGL policy that provided coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" The policy also covered bodily injury and property damage caused by products already sold by VE, under a "products-completed operations hazard" clause that stated:

A. Products–Completed Operations Hazard includes all bodily injury and property damage that arises out of your products if the bodily injury or property damage occurs after you have relinquished possession of those products.

The policy defined "your product" as "any goods or products ... manufactured, sold, handled, distributed, or disposed of by" VE, including "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product;' and the providing of or failure to provide warnings or instructions." Products-completed operations coverage was provided under the commercial general liability coverage part and did not provide separate coverage.

The original policy contained a pollution exclusion clause which precluded coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants" under certain enumerated circumstances not applicable to this dispute. Reliance does not deny that the original policy would have covered claims similar to those asserted in the underlying product liability actions and that the pollution exclusion clause contained therein would not have barred coverage.

In 1992, Vlacich, on behalf of Golodetz, contacted Ferrell to renew VE's policy. Vlacich informed Reliance of VE's specific insurance needs as a "manufacturer of products," and requested coverage for losses arising out of those products. Despite these communications, the renewal policy issued by Reliance contained a TPE that read:

**TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under COVERAGE A (Section I) is replaced by the following:

[This insurance does not apply to:]

f.(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, disper-

---

**2.** The *Drumheller* action is still pending in the Chester County Court of Common Pleas.

sal, seepage, migration, release or escape of pollutants at any time.

The endorsement was preceded by the following words located at the top of the page: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The renewal policy became effective May 1992. However, Reliance did not send the policy to MLW until August 1992. VE did not receive the policy until November 1992, six months after the effective coverage date. At no time during the negotiation of the 1992–93 renewal policy or after issuing the policy did Reliance inform Golodetz, VE or MLW that a TPE had been inserted, or that the policy would no longer cover claims arising out of the use of VE's products similar to the claims comprising the underlying litigation.

On appeal, Moessner contends that the district court erred in granting summary judgment in favor of Reliance. He argues that the TPE is ambiguous, that VE's commercial status does not preclude application of the reasonable expectations doctrine, and that, under the circumstances of this case, VE had a reasonable expectation of coverage for the underlying claims.

## II.

■ Summary judgment is appropriate only when the admissible evidence fails to demonstrate a genuine issue of material fact and the moving party (here Reliance) is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party (Moessner) creates a genuine issue of material fact if he provides sufficient evidence to allow a reasonable jury to find for him at trial. *See Connors v. Fawn Mining Corp.*, 30 F.3d 483, 489 (3d Cir.1994) (citations omitted). We give the nonmoving party the benefit of all reasonable inferences. *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir.1997). Our review of the district court's grant of summary judgment is plenary. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). The parties agree that Pennsylvania law governs this case. In the absence of an authoritative pronouncement from the Pennsylvania

Supreme Court, we may examine lower state court decisions as indicia of how the state's highest court might decide this issue. *Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 70 n. 3 (3d Cir.1983).

### A. Coverage Under The Renewal Policy: The Question of Ambiguity

■ Moessner's threshold assault on the TPE is based on the contention that it is ambiguous (and hence must be construed against the insurer). He acknowledges that the terms "discharge," "dispersal," and "release," when read broadly, appear to bar coverage for the carbon-monoxide poisoning injuries. He submits, however, that the language of the exclusion, i.e., the use of the terms "discharge," "dispersal," "seepage," "migration," "release," and "escape," which he views as "environmental terms of art," "strongly suggests that [the TPE] only applies to environmental catastrophes." Reliance, supported on this point by amicus Insurance Environmental Litigation Association, argues that the underlying claims for bodily injury allegedly arising out of the discharge of carbon monoxide—a toxic gas—squarely fall within the TPE, and that Moessner's claim that the pollution exclusion is ambiguous because its terms "*suggest* that the exclusion only applies to environmental catastrophes" ignores the "plain language" doctrine and Pennsylvania precedent. We agree.

■ The interpretation of an insurance contract is a question of law that is properly decided by the court. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 304–05, 469 A.2d 563, 566 (1983). In determining whether a contract is ambiguous, the court must examine the questionable term or language in the context of the entire policy and decide whether the contract is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gamble Farm Inn, Inc. v. Selective Ins. Co.*, 440 Pa.Super. 501, 656 A.2d 142, 143–44 (1995) (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 201, 519 A.2d 385, 390 (1986)). Where a provision of a policy is ambiguous, the provision should be construed in favor of the insured and

against the insurer, the drafter of the agreement. *Standard Venetian Blind,* 503 Pa. at 305, 469 A.2d at 566. If, however, the terms of the policy are clear and unambiguous, the general rule in Pennsylvania is to give effect to the plain language of the agreement. *Bensalem Tp. v. International Surplus Lines Ins. Co.,* 38 F.3d 1303, 1309 (3d Cir. 1994).

Our examination of Pennsylvania Superior Court decisions, which we believe the Pennsylvania Supreme Court would follow, together with an analysis of the policy language itself, leads us to conclude that the renewal policy is unambiguous, and that its plain language would bar coverage for the underlying claims in the *Moessner* action. At the outset we note that the Pennsylvania Superior Court has consistently interpreted pollution exclusion clauses to be clear and unambiguous. *See, e.g., O'Brien Energy Systems v. American Employers' Ins. Co.,* 427 Pa.Super. 456, 629 A.2d 957 (1993); *Lower Paxton Tp. v. United States Fidelity & Guaranty Co.,* 383 Pa.Super. 558, 557 A.2d 393 (1989); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984). In so doing, the Court has interpreted pollution exclusion clauses broadly.

In *Madison Construction,* for example, where the underlying claim involved the escape of fumes from a curing agent into an enclosed space, the insured contended that the pollution exclusion clause was inapplicable because the exclusion only bars coverage for claims involving the escape of fumes "into the environment."[3] The court rejected this argument, concluding that the language of the policy unambiguously barred coverage. *See Madison Construction v. Harleysville Mut. Ins. Co.,* 451 Pa.Super. 136, 144, 678 A.2d 802, 806 (1996), *allocatur granted,* 547 Pa. 384, 690 A.2d 711 (1997); *see also Brown v. American Motorists Ins. Co.,* 930 F.Supp. 207, 209 (E.D.Pa.1996) (pollution exclusion clause interpreted to bar coverage for a claim arising out of the escape of fumes from a chemical waterproofing sealant into a home). With the Pennsylvania courts' view of pollution exclusion clauses as a backdrop, we conclude that the TPE involved here, *see supra* at p. 900, admits of no ambiguity in its exclusion of claims such as those underlying Moessner's action. It clearly states that the exclusion applies to the escape of pollutants "at any time," and contains no language limiting its scope to environmental catastrophes.

Despite the clarity of the TPE's language, Moessner suggests that Pennsylvania courts, as a matter of policy, only apply a pollution exclusion clause to bar coverage for claims in the nature of an "environmental catastrophe." This contention is unsupported by Pennsylvania case law. In *Madison Construction,* the court held that, where the exclusion clearly and unambiguously precluded coverage for the claims, it would not consider the insured's public policy argument, but instead would defer to the plain language of the policy. 451 Pa.Super. at 144, 678 A.2d at 806;[4] *see also Lower Paxton Tp.,*

---

**3.** This clause precluded coverage of:

f. (1) bodily injury ... arising out of the ... discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

\* \* \*

(d) At or from any premises, site or location on which any insured or any contractors ... working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor....

*Madison Construction,* 678 A.2d at 804.

**4.** Moessner also relies on *Island Associates, Inc. v. Eric Group, Inc.,* 894 F.Supp. 200 (W.D.Pa.

1995), to support his argument. In that case, the district court held that a pollution exclusion clause did not bar coverage for claims arising out of the escape of fumes from a cleaning agent released into an enclosed area, concluding, in part, that the terms "discharge," "dispersal," "release," and "escape" as used in the exclusion at issue were "environmental terms of art" such that pollution exclusion clauses utilizing the terms are applicable only with respect to discharges of pollutants into the environment. *Id.* at 203–04. However, in *Madison Construction,* which was decided subsequent to *Island Associates, Inc.,* the Pennsylvania Superior Court implicitly rejected the court's analysis in *Island Associates, Inc.* when it determined that a pollution exclusion clause containing the terms "discharge," "seepage," "migration," "release," and "escape," the exact terms upon which Moessner relies to make his argument, barred coverage for

383 Pa.Super. at 566–67, 578 n. 5, 557 A.2d at 396–97, 402, n. 5 (declining to address public policy arguments in favor of coverage where the language of the exclusion is plain and unambiguous).

Moessner also contends that the TPE is ambiguous under *Gamble Farm*. In *Gamble Farm*, the Superior Court held that the total pollution exclusion at issue was ambiguous and did not preclude coverage for claims involving injury from the escape of gases or fumes from a clogged water heater into a restaurant. · The court concluded that the ambiguity in the pollution exclusion arose from the use of the word "atmosphere" in the clause "into or upon land, the atmosphere or any water course or body of water," where there was no extrinsic evidence to reveal the meaning of the word.[5] 440 Pa.Super. at 510, 656 A.2d at 146. Relying on the particular terms of the pollution exclusion at issue, and concluding that the language of the clause indicated that it applied only to losses in the nature of an environmental catastrophe, the court determined that, where the claim concerned the escape of fumes into an enclosed area, the exclusion was ambiguous and did not bar coverage for the losses. *Id.* at 510–11, 656 A.2d at 146–47. Thus, the court granted summary judgment in favor of the insured. But *Gamble Farm* is not controlling because of the difference in the language between the policies.

In *Madison Construction*, the court acknowledged a distinction between pollution exclusion clauses containing the "into the atmosphere" language to describe the area into which the pollutant must escape, as in *Gamble Farm*, and those clauses not containing such language:

It is important to distinguish the Harleysville–Madison exclusionary provision from pollution exclusion provisions found in many other insurance policies. Other provisions often contain the language "into

the atmosphere" when describing the area into which a pollutant must escape so that the exclusion applies. Such language, when given its technical effect, will most likely preclude insurance companies from denying coverage for accidents occurring within a confined area because such an occurrence does not result in the release of pollutants "into the atmosphere." *See generally Gamble Farm Inn, Inc. v. Selective Ins. Co.*, 440 Pa.Super. 501, 656 A.2d 142 (1995) (holding that "atmosphere" within the meaning of pollution exclusion in CGL policy did not include the release of the pollutant into the air within the insured's building). Additionally, many courts have held this term to be ambiguous, and the exclusion inapplicable, thus resulting in a verdict against the insurer. *Id.*

*Madison Construction*, 451 Pa.Super. at 143, 678 A.2d at 805. Noting that the pollution exclusion clause at issue in the case did not contain the critical "into the atmosphere" language upon which the insured relied, the court refused to create an ambiguity in the policy by reading the "into the atmosphere" language into the clause. *Id.* at 144, 678 A.2d at 806.

The TPE involved here does not use the words "into the atmosphere" or in any way indicate that "environmental catastrophes" are the conditions that trigger a bar of coverage under the exclusion. In the absence of this language, we will not construe the provision to create an ambiguity that does not exist. *See, e.g., Madison Construction*, 451 Pa.Super. at 144, 678 A.2d at 805–06. Accordingly, we agree with the district court that the TPE, as applied in this case, unambiguously bars coverage for the claims asserted in the underlying litigation, and turn to the question whether VE's reasonable expectations of coverage should be enforced

claims arising out of the escape of fumes into an enclosed area. *See Madison Construction*, 451 Pa.Super. at 144, 678 A.2d at 805–06.

**5.** The exclusion clause at issue in *Gamble Farm* specifically defined pollution hazard as "exposure ... to irritants or toxic substances, including smoke, vapors, soot, fumes, acids or alkalis,

and waste materials consisting of or containing any of the foregoing arising out of the discharge, dispersal or release or escape of any of the aforementioned irritants, contaminants or pollutants *into or upon land, the atmosphere or any water course or body of water*." *Gamble Farm*, 440 Pa.Super. at 504, 656 A.2d at 143.

despite the plain language of the renewal policy.[6]

## B. The Reasonable Expectations Doctrine

 Pennsylvania case law, expressed in *Collister v. Nationwide Life Insurance Co.*, 479 Pa. 579, 388 A.2d 1346 (1978), and restated in *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 513 Pa. 445, 521 A.2d 920 (1987), dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured. *See also Gilderman v. State Farm Ins. Co.*, 437 Pa.Super. 217, 649 A.2d 941 (1994), *appeal denied*, 541 Pa. 626, 661 A.2d 874 (1995); *Frain v. Keystone Ins. Co.*, 433 Pa.Super. 462, 640 A.2d 1352, 1354 (1994). In most cases, "the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Bensalem Tp. v. International Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir.1994). Courts, however, must examine "the totality of the insurance transaction involved to ascertain the reasonable expectations of the insured." *Dibble v. Security of Am. Life Ins. Co.*, 404 Pa.Super. 205, 590 A.2d 352, 354 (1991) (*quoted in Bensalem Tp.*, 38 F.3d at 1309). As a result, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage. *See Bensalem Tp.*, 38 F.3d at 1311; *see also Tonkovic*, 513 Pa. at 455, 521 A.2d at 926 (*citing Collister*, 479 Pa. at 594–95, 388 A.2d at 1353–54) (Regardless of the ambiguity or lack thereof, inherent in a conspicuous exclusion provision, courts should assure that the insured's "reasonable expectations are fulfilled.").

 In *Tonkovic*, the Pennsylvania Supreme Court expressly applied the doctrine of reasonable expectations. In that case, the insured requested a specific type of insurance coverage and the insurance carrier failed to honor that request, unilaterally limiting the scope of coverage in a conspicuous provision in the policy. The Supreme Court concluded that, regardless of the ambiguity or lack thereof inherent in an insurance policy, courts should ensure that the insured's "reasonable expectations are fulfilled." 513 Pa. at 455, 521 A.2d at 926 (*citing Collister*, 479 Pa. at 594–95, 388 A.2d at 1353–54). Thus, the Court held:

> When the insurer elects to issue a policy differing from what the insured requested and paid for, there is clearly a duty to advise the insured of the changes so made. The burden is not on the insured to read the policy to discover such changes, or not read it at his peril.

513 Pa. at 454, 521 A.2d at 925.[7]

Additionally, in *Bensalem Township*, which involved circumstances similar to this case,

---

**6.** Moessner suggests that the policy is "ambiguous as a whole" because the structure of the policy implies that coverage under the products-completed operations clause is separate from the coverage provided under Coverage A of the policy, and that the TPE does not apply to the products-completed operations clause. We disagree. A similar argument was rejected by the Court of Appeals for the Fifth Circuit in *Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203 (5th Cir.1991), where the court determined that coverage under a products-completed operations hazard was afforded by the bodily injury or property damage coverage under Coverage A, to which the pollution exclusion clause at issue applied. *Id.* at 208.

**7.** Significantly, the court in *Tonkovic* was careful to distinguish its prior decision in *Standard Venetian Blind*. In *Standard Venetian Blind*, the insured, a contractor, sought coverage under a policy of liability insurance for damage caused to its products. The policy contained a clause that expressly excluded such losses from coverage

under the policy. The court held that, regardless of whether the insured read and understood the exclusion, the language of the policy clearly excluded coverage of the insured's claim. In *Tonkovic*, the court distinguished *Standard Venetian Blind*, noting that "[c]ontrary to the facts in *Venetian Blind*, appellant here specifically requested a type of coverage that would have protected him in this instance...." *Tonkovic*, 513 Pa. at 451, 521 A.2d at 924. Moreover, the court found:

> a crucial distinction between cases where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested, and cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for.

*Id.*, at 454, 521 A.2d at 925. In the latter situation, the *Tonkovic* court observed, there was no reasonable expectation of coverage. *Id.* at 451, 521 A.2d at 923.

we examined Pennsylvania law and concluded that, despite an unambiguous exclusion of coverage contained in the insurance policy, Pennsylvania would honor an insured's reasonable expectation of coverage. 38 F.3d at 1311. Bensalem Township, the insured, had purchased a renewal policy that contained an exclusion significantly limiting the scope of coverage compared to a similar exclusion contained in the original policy. The Township may have been aware of the exclusion contained in its renewal policy but maintained that the insurer had not notified it of the exclusion nor explained the exclusion's significance, and that it reasonably expected the claim in question to be covered by the renewal policy. *Id.* at 1308–09.

Acknowledging Pennsylvania's consistent focus on the reasonable expectations of the insured, we noted that the Pennsylvania Supreme Court had held that "where . . . an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, *and understood*, the change, regardless of whether the insured read the policy." *Id.* at 1311 (*citing Tonkovic,* 513 Pa. at 454, 521 A.2d at 925). As a result, we determined that the district court erred when it dismissed the Township's complaint, and concluded that the Township's expectation of coverage would be reasonable, despite the exclusion, if it could demonstrate that the insurer did not change the language of the

exclusion until after it had agreed to renew the policy and that the insurer did not notify it of the change in the exclusion or explain the significance of the change. *Id.* at 1312. Unless VE is not entitled to the benefit of the reasonable expectations doctrine, *Bensalem Township* controls here.

## C. *Status as a Sophisticated Insured*

■ Notwithstanding Pennsylvania's enforcement of the reasonable expectations of an insured under circumstances similar to those presented here, and our recognition (in *Bensalem Township* ) of this approach, the district court held that VE's expectations as to the meaning of the TPE were irrelevant as a matter of law because of VE's status as a sophisticated purchaser of insurance. Reliance urges that this status precludes application of the reasonable expectations doctrine. More specifically, Reliance asserts that the courts adopted the reasonable expectations doctrine to combat the effects of the relatively unequal bargaining power exercised by insurer and insured, and that, where the insured is sophisticated, the doctrine has no role to play. While Reliance correctly identifies the rationale underlying the reasonable expectations doctrine, and there is no serious challenge to the district court's finding that VE was a sophisticated purchaser of insurance,[8] for reasons discussed below, we predict that Pennsylvania, which has not expressly opined on the point, will apply the

In light of *Standard Venetian Blind* and *Tonkovic,* Pennsylvania courts have consistently enforced the plain language of exclusions and limitations, despite the insurer's failure to make the insured aware of the provisions, where the circumstances indicate that the insured received exactly the coverage requested. *See generally Schneider v. Lindenmuth–Cline Agency,* 423 Pa.Super. 73, 620 A.2d 505, 509–10 (1993); *Koval v. Liberty Mut. Ins. Co.,* 366 Pa.Super. 415, 531 A.2d 487, 490 (1987), *appeal denied, Koval v. Liberty Mut. Ins. Co.,* 518 Pa. 619, 541 A.2d 746 (1988); *Banker v. Valley Forge Ins. Co.,* 363 Pa.Super. 456, 526 A.2d 434, 436–37(1987), *appeal denied,* 518 Pa. 623, 541 A.2d 1135 (1988).

**8.** A "sophisticated" insured is typically characterized as a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance. *See* Jeffrey

W. Stempel, *Reassessing the "Sophisticated" Policyholder Defense In Insurance Coverage Litigation,* 42 Drake L.Rev. 807, 808 n. 1 (1993). VE's assistance by outside legal counsel and an insurance broker was sufficient to support the district court's conclusion that VE was a sophisticated purchaser of insurance. *See, e.g., New Castle County v. Hartford Acc. & Idem. Co.,* 933 F.2d 1162, 1189 (3d Cir.1991) (noting in dicta that sophisticated purchaser of insurance was indicated by existence of legal advisors and insurance brokers); *Eastern Associated Coal Corp. v. Aetna Cas. & Sur.,* 632 F.2d 1068, 1075 (3d Cir.1980) (sophistication indicated by large corporate size and aid of counsel); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.,* 540 F.2d 1257, 1261 (5th Cir.1976) (sophistication indicated by large corporate status and aid of legal counsel and informed experts); *Eastcoast Equip. Co.,* 207 Pa.Super. at 384, 218 A.2d at 98 (sophisticated status indicated by large corporate size and aid of legal counsel).

doctrine to cases such as this, regardless of the insured's commercial status.

Pennsylvania's courts have long recognized that "insurance contracts are not freely negotiated agreements entered into by parties of equal status." *Collister,* 479 Pa. at 593, 388 A.2d at 1353; *see Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.,* 610 F.2d 1174, 1179–80 (3d Cir.1979); *McDonald v. Keystone Ins. Co.,* 313 Pa.Super. 404, 409, 459 A.2d 1292, 1295 (1983). In recognition of the "unique dynamics" between insurer and insured, courts have attempted to favor the insured in a number of ways, including adapting the *contra proferentem* principle of interpretation to the insurance context, by which ambiguities in policies are construed against the insurer, *see Erie Ins. Exch. v. Transamerica Ins.,* 516 Pa. 574, 533 A.2d 1363 (1987); *Restatement (Second) of Contracts* § 206 (1981); and the reasonable expectations doctrine, *see Collister,* 479 Pa. at 593, 388 A.2d at 1353 (The reasonable expectations doctrine compensates for the fact that "the conditions of an insurance contract are for the most part dictated by the insurance companies.").

While sophisticated insureds may exercise more bargaining power vis-a-vis the insurers, and therefore be in less need of protection from the courts than other insureds, the rationale of the reasonable expectations doctrine is still applicable when the insurer unilaterally alters the insurance coverage requested by the insured. In transactions involving sophisticated and unsophisticated insureds alike, the insured "has a right to expect that [it] will receive something of comparable value in return for the premium paid," yet the courts have recognized that the insured can be forced by the insurer "to rely upon the oral representations of the insurance agent." *Id.* The control exercised by insurers is especially problematic when the insured, whether sophisticated or not, does not receive the actual insurance policy until after offering to buy insurance and paying the first premium. *See* Robert Keeton, *Insurance Law Rights at Variance with Policy Provisions,* 83 Harv. L.Rev. 961, 968 (1970); *see also Zuckerman v.* *Transamerica Ins. Co.,* 133 Ariz. 139, 650 P.2d 441 (1982).

Moreover, when the insured does not know or have reason to know of the existence of an unfavorable provision, then the insured lacks the ability to negotiate a more favorable insurance policy, and its sophistication or putative bargaining power is meaningless. For this reason, the court's admonition in *Tonkovic,* 513 Pa. at 454, 521 A.2d at 925, that "[w]hen the insurer elects to issue a policy differing from what the insured requested and paid for, there is clearly a duty to advise the insured of the changes so made," remains applicable in the context of a sophisticated insured.

Our prediction that the Pennsylvania courts will extend the doctrine of reasonable expectations to cases such as this is bolstered by the fact that, although these courts initially adopted the *contra preferentem* principle of interpretation because they recognized the unbalanced relationship between insureds and insurers, they have routinely applied this principle to coverage disputes involving business insureds and even to disputes between insurance professionals, despite the parties' equal bargaining power. *See e.g., Erie Ins. Exch.,* 516 Pa. 574, 533 A.2d at 1366–67 ("Although this case involves a controversy between two insurers, we will consider each policy from the point of view of the insured and construe each policy most strongly against the insurer."); *Pennsylvania National Mut. Cas. Ins. Co. v. Traveler's Ins. Co.,* 405 Pa.Super. 149, 592 A.2d 51, 53–54 (1991) (same); *Guttman Oil v. Pennsylvania Ins. Guar. Ass'n,* 429 Pa.Super. 523, 632 A.2d 1345, 1347–48 (1993), *appeal denied,* 537 Pa. 663, 644 A.2d 1200 (1994) (construing policy against insurer where insured is an oil company); *Raybestos–Manhattan v. Industrial Risk Insurers,* 289 Pa.Super. 479, 433 A.2d 906, 908 (1981) (construing policy against insured where insured is a trucking business). *See also ACandS, Inc. v. Aetna Cas. & Surety Co.,* 764 F.2d 968, 973 (3d Cir.1985) (predicting that Pennsylvania's rule that insurance policies "must be strictly construed against insurers" applies where insured is large commercial entity); *Little v. MGIC*

*Indemnity Corp.,* 836 F.2d 789, 793 (3d Cir. 1987) (same).

Our prediction here—that the Pennsylvania courts will apply the reasonable expectations doctrine, regardless of whether the insured is sophisticated, if the insurer unilaterally inserts the contested provision in the insurance policy despite the insured's request for coverage—appears uncontroversial. This seems especially so in the wake of our decision in *Bensalem Township,* where the insured Township was a large and populous suburb of Philadelphia aware of the existence of the exclusion provision, we nevertheless directed the district court to examine whether "the insurer or its agent create[d] in the insured a reasonable expectation of coverage." 38 F.3d at 1311. Although the question we face here does not appear to have been briefed or argued in *Bensalem,* the fact is that we applied the reasonable expectations doctrine without regard to the Township's status as a sophisticated party.[9]

■ We add however, that while we predict that Pennsylvania will not make the status of the insured determinative of the applicability of the reasonable expectations doctrine, we also believe that it would deem the insured's status to be a factor to be considered when resolving whether the insured acted reasonably in expecting a given claim to be covered. As such, courts should carefully consider whether an insured of the specified level of sophistication had reason to know of the existence of the exclusion prior to purchasing or renewing the policy, and hence had effective control over the insurance transaction. *See Bensalem Tp.,* 38 F.3d at 1312 ("stress[ing]" that "if Township was aware of the change in the exclusion provision before it elected to renew its policy with Insured ... the Insurers must prevail" given the unambiguous language of the exclusion); *cf. Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.,* 610 F.2d 1174, 1179–80 (3d Cir.1979), 610 F.2d at 1179–80 (refusing to require the insurer to prove that it had ex-

plained an exclusionary provision to the insured where the insured was a professional insurance broker and where the exclusion had been read to the insured at the time of the transaction and the insured did not object or indicate that he did not understand the exclusion's terms).

#### D. *VE's Expectations of Coverage*

■ Applying these principles to the facts, we conclude that, given the circumstances of the transaction between VE and Reliance, a material issue of fact exists as to whether VE had a reasonable expectation that Moessner's claim would be covered. In drawing this conclusion, we consider the following factors. Under VE's original insurance policy, Moessner's vaporator-related claim would have been covered. At the time that the renewal policy was negotiated, VE, through its agent, informed Reliance about its specific insurance needs as a "manufacturer of products" and that it sought coverage for losses arising out of the use of those products. Despite these communications, Reliance unilaterally inserted the TPE endorsement into VE's renewal policy and never brought this change to VE's attention. We note in addition that Reliance eschewed, or at least did not pursue, any direct contact with Golodetz or VE in connection with the negotiation of the renewal policy prior to its issuance. Furthermore, after the issuance of the policy, Reliance did not discuss the TPE endorsement with MLW nor did it promptly send the renewal policy containing the endorsement to MLW. Instead, MLW did not receive the policy until August 1992, three months after its effective date, and VE did not receive it for an additional three months, halfway through the policy period and three months prior to Moessner's accident.

Despite VE's apparent unacquaintance with the TPE, Reliance maintains that VE had reason to know of its inclusion in VE's renewal policy because Golodetz, VE's parent corporation which originally put the policy out for bid, and MLW were familiar with the type of endorsement. Golodetz was familiar

---

9. Although it is unclear whether the Township consulted an insurance broker or counsel before procuring the insurance policy in question, it appears to be an insured with the "substantial economic strength, desirability as a customer," and "readily available assistance in understanding or procuring insurance," that typify a sophisticated party. *See* Stempel, *supra* at 808 n. 1.

with the TPE, as the same provision had been used in a prior policy of a Golodetz subsidiary, and Golodetz had previously negotiated exceptions to the endorsement in other policies. MLW was also familiar with the endorsement, as it had handled the negotiations relating to the Golodetz 1991–92 policy. These facts militate in favor of Reliance's position.

On the other hand, there are a number of countervailing factors. First, that the original policy was subject to bid by various insurance brokers is no indication that the policy was customized or tailored specifically to fit VE's insurance needs. This indicates no more than that VE sought the greatest amount of coverage for its operations at the best premium rates that it could obtain. Further, Golodetz and MLW's familiarity with the exclusion in other policies and its negotiations relating to the endorsement in other policies is not determinative of VE's reasonable expectations relative to this particular renewal policy transaction; without knowledge of the inclusion of the TPE endorsement in VE's renewal policy, neither Golodetz, MLW, nor VE could secure terms that would provide exceptions to the exclusion. These factors tip the balance in favor of the creation of a genuine issue of material fact.

Reliance also contends that VE had notice of the provision because the substantive language of the exclusion in the renewal policy was preceded by the following: "THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY. TOTAL POLLUTION EXCLUSION ENDORSEMENT." In fact, correspondence between VE and MLW indicates that the policies were reviewed by both entities. This fact changes little, however, because all indications are that VE's critical decision to renew the policy was made at the time that the renewal policy was negotiated, not three months later when, in August 1992, the policy was received by MLW. Furthermore, the earliest time that VE had an opportunity to review the policy and to notice, on its own, the substantive change in the policy's language, was November 1992, when it received the policy, and after the policy had been in effect for six months. It is certainly not clear that anything could have been done to change the policy's provisions at this point. In addition, the payment schedule for premiums relating to the renewal policy commenced in May 1992, before VE or its agent could review the issued policy, indicating that VE "invested" in the policy without any knowledge of the limited coverage it had purchased.

Reliance asserts that VE had constructive knowledge of the more limited scope of coverage provided by the renewal policy because VE's insurance premiums were drastically reduced from the original policy to the renewal policy. The original policy was issued for $82,000, but the premium charged for the renewal policy was $25,660. This change arguably reflects the inclusion of the TPE endorsement, placing VE on notice of the reduction in the coverage provided by the renewal policy. However, Reliance made several other significant changes between the original policy and the renewal policy, including a new asbestos exclusion, that could account for the variation in premiums charged. VE also had recently changed the scope of its operations from manufacturing products to contracting out its products, which could have accounted for the reduction in premiums from the original to the renewal policy.

Additionally, both the original and renewal policies were issued subject to the provisions of the Retrospective Premium Endorsement clauses contained in both policies. Under these clauses, VE's costs of insurance were rated retrospectively and VE was charged only an estimated initial premium for both policies. The premiums charged were based on all incurred losses as of a certain date. Over time, however, VE would become responsible to pay all the costs of any claims made under the policies. Accordingly, the variation in losses upon which the premiums were based could form the basis for the variation in premiums charged between the policies. The sum of these facts illustrates that the change in premiums may not be attributable solely to the TPE included by Reliance.

Finally, Reliance notes that VE had notice of the TPE when it received the renewal

policy in November 1992, over three months before Moessner's accident and his subsequent lawsuit. *Tonkovic* suggests that VE's alleged constructive knowledge of the change is irrelevant to whether it reasonably expected coverage. In that case, the Pennsylvania Supreme Court's conclusion that "[t]he burden is not on the insured to read the policy to discover such changes, or not read it at his peril" suggests that the insurer must inform the insured of any substantial unrequested change *before* the policy is instated. 513 Pa. at 454, 521 A.2d at 925. On the other hand, this characterization of the duty to inform seems a bit expansive. We thus believe that Pennsylvania would hold that the duty is presumptive, but can be set aside when a sophisticated insured is given constructive notice of a change at a time when it can negotiate an alteration in the policy. Whether VE, once it received the renewal policy, was on notice of the TPE's inclusion and could have negotiated a change six months into the year-long policy period is a factual determination better left to the district court.

Under all these circumstances, even assuming that VE had notice of the TPE upon receipt of the policy, we cannot find that, as a matter of law, VE's expectation of coverage was unreasonable. Consistent with this opinion, the judgment of the district court will therefore be reversed and remanded for further proceedings.