**12TH STREET GYM, INC. and Robert Guzzardi,**

v.

**GENERAL STAR INDEMNITY CO.**

No. Civ. A. 94–5757.

United States District Court, E.D. Pennsylvania.

Oct. 7, 1997.

---

H. Graham McDonald, Turner & McDonald, Philadelphia, PA, for Plaintiffs.

William H. Black, Jr., M. Jane Goode, Heckler, Brown, Sherry and Johnson, Philadelphia, PA, for Defendant.

## MEMORANDUM

LUDWIG, District Judge.

This declaratory judgment action, which involves the construction of a health club liability insurance policy, was remanded by our Court of Appeals, 93 F.3d 1158, 1166 (3d Cir.1996). The complaint, filed by plaintiffs 12th Street Gym, Inc. and Robert Guzzardi, sought a determination as to coverage of a claim occasioned by the expulsion from the health club of a club member who had AIDS. *Silverman v. 12th Street Gym et al.*, No. 94–CV–5038. In disclaiming coverage, the insurer, defendant General Star Indemnity Co., asserted the policy's Sexually Transmitted Disease Exclusion.[1] On defendant's ap-

---

**1.** The insurer also counterclaimed for reimbursement of $35,000, which it had advanced to de-
fend and settle the underlying action on the basis of a reservation of rights. *See infra* at 799–800.

peal, following the grant of plaintiff's summary judgment motion,[2] a divided panel of the Court of Appeals held the exclusion to be ambiguous.[3] It remanded for the consideration of extrinsic evidence that might clear up the ambiguity.[4]

In concluding that the exclusion was "reasonably susceptible to more than one interpretation," *12th Street Gym v. General Star Indemnity Co.*, 93 F.3d 1158, 1165–66 (3d Cir.1996), the appellate decision identified three areas of inquiry: 1) the term "sexually transmitted disease" might encompass all diseases that conceivably could be sexually transmitted, or it could be limited to diseases that have actually been transmitted through sexual conduct; 2) the intended scope of the exclusion is undefined—is the mere existence of a sexually transmitted disease sufficient to trigger the exclusion or is exposure or fear of exposure to the disease required?; and 3) most importantly, what was the "required nexus" between a claim and a "sexually transmitted disease"? *Id.*

The decision also noted the insurance company's position, taken on appeal, that claims with even a "remote" connection to a sexually transmitted disease were excluded from coverage. *Id.* In support of its motion for summary judgment defendant had submitted an affidavit from the policy underwriter, which represented that "it was the underwriter's intention to exclude from coverage claims such as those which are stated in [Silverman's complaint] . . . ." Ex. 5 at ¶ 9. However, the affidavit delimited the exclusion in that "it was not [the underwriter's] intention . . . to exclude coverage for claims in which the involvement of a sexually transmitted disease was irrelevant or purely incidental to the claim . . . ." *Id.* at ¶ 8. The opinion characterized the distinction between a "remote"

and an "incidental" connection as potentially "significant." 93 F.3d at 1166.[5]

## I.

Upon remand, a hearing was held to consider additional extrinsic evidence in regard to the exclusion. The following facts were set forth in a stipulation:

1. Plaintiff 12th Street Gym, Inc., is a health and exercise club located in Philadelphia. In February and March, 1994, plaintiff Guzzardi was an owner and the president of 12th Street Gym, Inc.

2. General Star Indemnity Company is an excess and surplus lines insurer that provides third-party liability insurance to commercial entities, including health and tennis clubs.

3. General Star Indemnity Company provided commercial liability insurance to 12th Street Gym and Guzzardi in accordance with the terms and conditions of General Star Policy No. IMA 212509.

4. In February, 1994, Irving Silverman was a member of 12th Street Gym. In 1990, Silverman had been diagnosed as having AIDS.

5. On August 17, 1994, Silverman instituted a lawsuit against the gym and Guzzardi in response to incidents in February and March, 1994, that allegedly occurred at the gym because Silverman had AIDS. The amended complaint, filed September 16, 1994, asserted causes of action for discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12181, as well as stated claims for intentional and negligent infliction of emotional distress; invasion of privacy; fraudu-

---

2. *12th Street Gym, Inc. v. General Star Indemnity Co.*, No. 94–5757, slip op. at 1–2 (E.D.Pa. Sept.5, 1995).

3. The dissent (Roth, J.) would have reversed and entered judgment for defendant. 93 F.3d at 1167–71.

4. The decision vacated the holding that "[t]he underlying complaint is based on Irving Silverman's alleged exclusion from the 12th Street

Gym—not on his purportedly having a sexually transmissible disease," but adopted the alternative determination that "to the extent AIDS was implicated, it was not as a sexually transmissible disease." 93 F.3d at 1164.

5. The procedural history of the case is set forth more fully in the appellate opinion. 93 F.3d at 1160–61.

lent misrepresentation; and civil conspiracy and defamation.

6. The policy issued to 12th Street Gym provided coverage for, among other things, "personal injury" liability in accordance with the following:

## PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this coverage part applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result.

.    .    .    .    .

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

Ex. 1 at 4.

7. The policy defined the term "personal injury" as follows:

10. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. false arrest, detention or imprisonment;

b. malicious prosecution;

c. the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. oral or written publication of material that violates a person's right of privacy.

Ex. 1 at 11.

8. In September, 1994, General Star declined to defend Silverman's action against 12th Street Gym and Guzzardi based in part on the following:

## 15. SEXUALLY TRANSMITTED DISEASE EXCLUSIONS

This insurance does not apply "bodily injury" "property damage" "personal injury" "professional liability" or advertising injury" with respect to any claim, suit or cause of action arising directly or indirectly out of instances occurrences or allegations involving sexually transmitted diseases, including Acquired Immune Deficiency Syndrome (AIDS). This exclusion shall apply regardless of the legal form any claim may take. As an example, this insurance shall provide no coverage for a claim alleging that any Insured was negligent or in breach of contract by maintaining premises where the Insured knew, or should have known, diseases might be sexually transmitted.

Ex. 1. at 14.

9. In February, 1995, the action brought by Silverman was settled with the consent of General Star and with a complete release of all claims against 12th Street Gym, Guzzardi and General Star. General Star paid for the defense and advanced the cost of settlement, subject to a reservation of its right to contend, *inter alia*, that it was not obligated to indemnify 12th Street Gym and Guzzardi and was, therefore, entitled to repayment of the amount advanced to fund the settlement.

10. On February 6, 1995, plaintiffs filed an amended complaint requesting declaratory relief and damages. The sole issue presented is defendant's obligation to indemnify plaintiffs in the underlying case.

11. On February 16, 1995, defendant filed its answer and a counterclaim re-

questing repayment of the amount paid to fund the settlement plus attorney's fees and costs.

12. On September 5, 1995, the parties entered into a stipulation by which General Star agreed to withdraw all of its affirmative defenses to plaintiff's complaint, except those pertaining to the exclusion.

The factual findings made below are based on evidence received at the hearing. The witnesses for defendant General Star were the president of Atlantic Star Corporation and the underwriter responsible for putting the exclusion in the policy. N.T. at 26. Plaintiffs' sole witness was plaintiff Guzzardi, an attorney whose practice involves residential and commercial leasing. *Id.* at 9.

A. According to the amended complaint in the underlying suit, the claim arose from an incident in which Silverman nicked his finger on a locker in the gym. Guzzardi is alleged to have shouted, "We don't want your kind in here .... you're careless and could infect everybody." Ex. 2.

B. No evidence was introduced that Silverman actually had AIDS, or, if he had contracted AIDS, that he had done so as a result of sexual conduct.

C. In 1994, about 60 percent of 12th Street Gym's membership consisted of gay men and women, of whom an estimated 10–15 percent were HIV positive or had AIDS. N.T. at 5; Ex. 6 11 5–6.

D. The 12th Street Gym had formerly been the Camac, a well-known bath house. Guzzardi was aware that 12th Street Gym might also be perceived as a bath house, popular in the gay community in the 1980s as a place where sexual activity would occur. N.T. at 18.

E. In March, 1993, General Star renewed 12th Street Gym's insurance policy, the terms of which were identical to those of the previous policy, including the exclusion in question. From 1988, 12th Street Gym was insured by General Star. *Id.* at 5, 31.

F. At the time the policy was issued, Guzzardi did not read it. The policy was obtained by a representative[6] of the gym through its insurance agent, Evans, Conger, Brouchard and McCray, a professional insurance brokerage company. *Id.* at 5, 11.

G. Plaintiffs relied on the insurance agent to recommend the proper liability insurance coverage and to represent the interests of the gym in the insurance transaction. *Id.* at 11–12, 32.

H. The policy was issued on behalf of General Star by Atlantic Star, a wholesale brokerage firm that dealt with Evans, Conger, the insurance company. *Id.* at 31–32.

I. Since 1984, when the company was founded, Michael J. Wunderlich has been president of Atlantic Star. *Id.* Since 1969, he has worked in the field of commercial line insurance underwriting. *Id.* at 26–27.

J. In 1985, Wunderlich first encountered the exclusionary provision while working on an insurance policy for a health and tennis club issued by the Essex Insurance Company. *Id.* at 22. Wunderlich stated that Essex gave Atlantic Star the language of the exclusion and directed its inclusion in all health club and tennis club insurance policies. *Id.*[7]

K. Wunderlich did not draft the exclusion and did not know the source from which Essex obtained the language. *Id.* at 47.

L. Since 1986, Atlantic Star has routinely included the exclusion in all policies issued to gyms and tennis clubs. *Id.* at 34.

M. In 1986, the basic coverage form used in the industry for bodily injury and property damage was modified to include coverage for claims arising out of personal injury, advertising injury, and professional liability. In response to this change, in about 1989, Wunderlich amended the exclusion to include the words "personal injury, professional liability and advertising injury." *Id.* at 35. This change was made to ensure that the exclusion would be co-extensive with the coverage. *Id.* at 37.

N. Prior to the underlying lawsuit, no representative of General Star, Atlantic Star

---

6. The representative was not identified.

7. The relationship between Essex and Atlantic Star was not explained.

or Evans, Conger discussed the meaning of the exclusion with any representative of 12th Street Gym. *Id.* at 32–33.

O. Guzzardi's understanding was that the exclusion applied only to claims by persons who had contracted or feared that they would contract a sexually transmitted disease at the gym. N.T. at 5–6, 18. He also interpreted the provision to refer to the actual transmission of AIDS. His understanding was based on a brief discussion with the gym's representative who obtained the policy. It also reflected his own interpretation based on the media attention given to contracting AIDS through open cuts at doctors' and dentists' offices. *Id.* at 5–6, 15.

P. The underwriter's explanation as to the reason for the exclusion was that:

> The potential exposure of health and fitness establishments to claims which involve sexually-transmitted diseases such as AIDS was large and difficult to evaluate and therefore not a risk which the insurer should undertake to insure. *Id.* at 23; Ex. 5 ¶ 7.

Wunderlich explained further:

> There are approximately 12 million sexually-transmitted diseases, new cases every year that occur. Health clubs have a lot of exposure because of tanning beds, Jacuzzis, saunas, steam rooms and a lot of members or people using those apparatuses or facilities are known to the insured that could easily have some type of sexually-transmitted disease; Herpes or something that thrives in warm types of environments, moist, warm environments and facilities. It's impractical for a club owner to come back and disinfect every bicycle or steam room after everybody's been in it.

N.T. at 23–24.

Q. General Star and American Star do not appear to have communicated to plaintiffs or their insurance agent the insurance company's views as to the meaning of the exclusion.

R. The underwriter's intention was to exclude any type of claim that might result from bodily injury, property damage, or personal injury "relating to sexually-transmitted disease." *Id.* at 34. His intent was that the exclusion would apply without an allegation of sexual conduct. This included personal injury claims that arose in connection with a disease that could be sexually transmitted, such as the claims in the underlying action. *Id.* at 40.

S. Under the policy, a claim for actual transmission of a sexually transmitted disease would be "bodily injury" and not "personal injury." *Id.* at 37.

T. Plaintiff Guzzardi reasonably believed the exclusion applied to those occurrences in which the claim was based on exposure or fear of exposure to a sexually transmitted disease at the gym. *Id.* at 1, 11, 12, 13, 18 and 24.

General Star did not introduce evidence from which either the meaning of the term "sexually transmitted disease," or the scope of the exclusion, or the nexus between a claim under the policy and the exclusion could be adequately determined.

## II.

■ As a general principle, an insurance contract is to be construed by the court. *Visiting Nurse Ass'n v. St. Paul Fire & Marine Ins.,* 65 F.3d 1097, 1100 (3d Cir.1995) (citing *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 305, 469 A.2d 563, 566 (1983)). The goal is to "ascertain the intent of the parties as manifested by the language of the policy." *12th Street Gym,* 93 F.3d at 1165 (citing *Visiting Nurse Ass'n,* 65 F.3d at 1100). In cases where the wording is ambiguous, relevant extrinsic evidence should be considered to resolve the ambiguity. *See Bokunewicz v. Purolator Products, Inc.,* 907 F.2d 1396, 1401 (1990) (citing *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 201, 519 A.2d 385, 390 (1986)). When such evidence does not resolve the dispute, the policy provision is to be construed in favor of the insured and against the insurer as the drafter of the agreement. *Bateman v. Motorists Mutual Ins. Co.,* 527 Pa. 241, 590 A.2d 281 (1991). Additionally, "if an insurer seeks to avoid its duty to defend under the policy on the basis of an exclusion to that policy, the insurer bears the burden to prove the applicability of that ex-

clusion." *American States v. Maryland Casualty*, 427 Pa.Super. 170, 183, 628 A.2d 880, 887 (1993).

Here, unfortunately, the extrinsic evidence presented is insufficient to resolve the exclusion's ambiguities. The term "sexually transmitted disease" is not defined in the policy, nor does the extrinsic evidence illuminate its meaning. Moreover, the scope of the provision does not appear to have been discussed by the parties in negotiating the insurance contract.

■ The underwriter's intention was to have the exclusion apply broadly, so as to bar all claims even remotely related to sexually transmittable diseases—regardless of how the disease, in a given instance, may have actually been transmitted. However, the policy language does not articulate such intent or provide a reasonable basis for plaintiffs to have reached that conclusion. In order to have probative value in construing an ambiguous contract, extrinsic evidence must relate to the mutual intent of the parties. *Asplundh Tree Expert Co. v. Pacific Employers Ins. Co.*, 1992 WL 382373 (E.D.Pa.1992) ("Extrinsic evidence of undisclosed or unilaterally expressed intent is immaterial"); *State Automobile Ins. Assoc. v. Anderson*, 365 Pa.Super. 85, 89, 528 A.2d 1374, 1376 (1987) ("Our law has never indicated that one party's subjective intent or understanding of a contractual obligation controls that obligation").

■ As between the present policyholder and the insurer, it is evident that there was no mutual understanding of the meaning of the exclusion. In such a case, the law requires that the exclusion be interpreted according to the reasonable expectations of a similarly situated insured. *State Automobile*, 365 Pa.Super. at 89, 528 A.2d at 1376 ("If there is not an actual understanding of the contractual obligation, then it is considered to be that which a reasonable person in similar circumstances would understand the contract to be"); *see Dibble v. Security of America Life Ins.*, 404 Pa.Super. 205, 210, 590 A.2d 352, 354 (1991) (the reasonable expectation of the insured is the proper focus regarding issues of coverage under insurance contracts) (citing *Collister v. Nationwide*

*Life Ins. Co.*, 479 Pa. 579, 388 A.2d 1346 (1978)). To do so, it is necessary to examine "the totality of the insurance transaction involved to ascertain the reasonable expectations of the consumer." *Dibble*, 404 Pa.Super. at 210, 590 A.2d at 354.

Plaintiff Guzzardi's expectation was that only claims arising out of the actual transmission or fear of sexually transmitted diseases on the premises would be excluded. That understanding of the exclusion was not unreasonable. It is well known that the AIDS virus can be transmitted non-sexually, such as by blood transfusion and other nonsexual exposure, as well as sexually. This distinction is important in defining the universe of claims intended to have been excluded. The first sentence of the exclusion, which describes its scope refers to "sexually transmitted diseases, including ... (AIDS)." This phrase can be read to mean either diseases that have actually been transmitted by sexual contact or diseases that are capable of being sexually transmitted. *12th Street Gym*, 93 F.3d at 1165. This equivocal provision could have been easily clarified by the use of the word "transmissible," Webster's II New Riverside Dictionary at 1227 (1994) ("Able to undergo transmission"). Or, it could have been drafted, in so many words, with no ambiguity, "diseases that were sexually transmitted or are capable of being sexually transmitted."

■ It is notable that the third sentence of the exclusion contains "an example" of "no coverage." It speaks of "premises where the Insured knew, or should have known, diseases might be sexually transmitted." Ex. 5 at 14. This phraseology is plainly equatable with actual transmission—and not transmissibility. To the extent that it refers back to the same verbiage used in the first sentence, it strengthens the conclusion that "sexually transmitted" denotes actual transmission. Given that the exclusion here is to be construed against the insurer as drafter, the narrower reading appears to be proper. *See Reliance Insurance Co. v. Moessner*, 121 F.3d 895, 900–01 (3d Cir.1997) (citing *Standard Venetian Blind*, 503 Pa. at 305, 469 A.2d at 566); *Ready Food Products, Inc., v.*

*Great Northern Ins. Co.,* 417 Pa.Super. 643, 648, 612 A.2d 1385, 1388 (1992) (language of insurance exclusion construed against drafter where "definitions are nowhere contractually provided for the terms in question"). This view is consistent with objectively ascertainable intent. Excluded are claims for "personal injury" and "bodily injury" that arise from allegations of actual sexual conduct in establishments where diseases, such as AIDS, are transmitted on the premises. Not excluded are claims arising simply and solely because persons on the premises have a sexually transmissible disease.

### III.

### Conclusions of Law

1. The language of the exclusion, drafted by the insurer, is ambiguous in that it is reasonably susceptible to more than one construction.

2. The extrinsic evidence is insufficient to resolve the ambiguity, and, since a mutual understanding of the exclusion is lacking, the provision should be construed in favor of the insured.

3. Defendant has not sustained its burden of proving the applicability of the exclusion to the underlying case.

4. Coverage for Silverman's claims for personal injury was not excluded, and defendant insurer is, therefore, not entitled to reimbursement for the amounts paid in defending and settling the underlying suit.

On the parties' respective cross-motions for summary judgment, a decision will be entered in favor of plaintiffs 12th Street Gym and Robert Guzzardi and against defendant General Star Indemnity Co.