Ruth E. BARRER and Estate
of Sidney Barrer,

v.

METROPOLITAN LIFE INSURANCE
COMPANY.

No. CIV.A. 99–CV–3947.

United States District Court,
E.D. Pennsylvania.

July 16, 2001.

David E. Stern, Wolf, Block, Schorr and Solis–Cohen, LLP, Philadelphia, PA, for plaintiffs.

Veronica W. Saltz, Nolte, Brodoway & Saltz, Philadelphia, PA, for defendants.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

Metropolitan Life Insurance Company now moves for summary judgment pursuant to Fed.R.Civ.P. 56 on Plaintiffs' Complaint for Declaratory Judgment. For the reasons enumerated below, the motion shall be granted.

### History of the Case

On or about January 26, 1961, Metropolitan Life Insurance Company ("Met Life") issued a whole life insurance policy on the life of Sidney Barrer, then age 37, in the face amount of $100,000. Premiums were payable annually, in the amount of $2,752.50 on the anniversary date of the policy until the anniversary following the insured's 90th birthday.[1] The policy's owner/beneficiary was Mr. Barrer's wife, Ruth.

The Barrers made the annual premium payments on this policy upon receipt of a bill from the defendant company every year until January, 1980. Apparently, the Barrers did not receive any further bills or notices from Met Life regarding the policy ever again after having received the bill for the annual premium which was due on January 26, 1979, despite the fact that they and their family remained in contact with their long-time Met Life representative, Richard Shiffer. Since they did not receive any bills or notices concerning the policy, the Barrers did not make any further premium payments after the January 26, 1979 payment.

The policy, however, included a provision that automatically converted the policy to extended term insurance "if premiums have been paid for at least the

number of years for which a period of Extended Term Insurance is first shown in the Table on Page 6." Given that the Barrers had paid the premiums on the policy for some 18 years, the whole life policy was automatically converted to an extended term policy and remained in effect for an additional 15 years and 216 days from the due date of the premium in default. The policy also retained some cash value, albeit at a reduced rate than that which it would have had had the premiums continued to be paid. Similarly, the policy also provided that, in the event a premium payment was in default beyond the 31 day grace period, it could be reinstated within five years after the due date of the first premium in default subject to production of evidence of insurability satisfactory to the company, payment of all overdue premiums with 5% interest per year and payment of any outstanding indebtedness at the end of the grace period, also with 5% interest per year. If more than five years elapsed since the due date of the first premium in default, the policy could be reinstated "subject to such conditions and payments as may be determined by the Company."

On January 12, 1989, the Barrers, through their attorney, wrote Met Life's Policyholder Service Department asking that the company advise as to whether there were any outstanding policy loans, what the current death benefit and cash surrender values were and seeking confirmation that either Ruth Barrer or her estate was the current beneficiary. Met Life responded via letter dated February 2, 1989 that:

> The cash surrender value of this policy was determined as of February 7, 1989.

---

1. While the total premium of $2,670.50 for the life insurance was payable for the full 53 years, the $82.00 premium for double indemnity coverage was only payable for 32 years.

Premiums for this policy were discontinued after they were paid to January 26, 1980. The policy contains a provision which says that if premiums are stopped, any available cash value will be used to automatically continue the policy in benefit as Paid–Up Term Insurance. This means that the insurance coverage remains in effect, but only for a limited time.

Under this provision, the policy has been continuing in benefit for $102,880.00 of Paid–Up Term Insurance. This is the amount that would be paid if the insured dies before December 11, 1996.

The present cash surrender value of the policy is $33,674.68. However, this amount is subject to change, generally being reduced due to the cost of providing the term insurance protection.

PLEASE BE ADVISED THAT ALL LOANS WERE CANCELLED AT THE TIME THE POLICY LAPSED ONTO PAID–UP TERM INSURANCE. THE BENEFICIARY IS RUTH BARRER.

Apparently, neither the plaintiffs nor their attorney responded to this letter or made any further efforts to contact the defendant company before the policy expired on December 11, 1996. Sidney Barrer died on February 15, 1998. On or about March 20, 1998, Mrs. Barrer's attorney telephoned Met Life and received the materials necessary for filing a claim for benefits. On March 23, 1998, the claim was denied as coverage had expired on December 11, 1996 and the policy had no value at the time of Mr. Barrer's death. The plaintiffs thereafter filed this lawsuit on June 28, 1999 in the Court of Common Pleas of Berks County for breach of contract and bad faith. The case was removed to this Court on August 4, 1999.

### Summary Judgment Standards

It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is properly rendered:

"... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

Stated more succinctly, summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oritani Savings & Loan Association v. Fidelity & Deposit Company of Maryland*, 989 F.2d 635, 638 (3rd Cir.1993); *Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125–26 (3rd Cir.1994); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 700 F.Supp. 838, 840 (W.D.Pa.1988). An issue of material fact is said to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmov-

ing party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In *Celotex Corp. v. Catrett, supra*, the Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment. Specifically the Court in that case held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The Court also held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). This does not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose its own witnesses. Rather, Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c),except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the required showing that a genuine issue of material fact exists. *Id.* See Also, *Morgan v. Havir Manufacturing Co.*, 887 F.Supp. 759 (E.D.Pa.1994); *McGrath v. City of Philadelphia*, 864 F.Supp. 466, 472–73 (E.D.Pa.1994).

### Discussion

It is Defendant's position that as there is no evidence that the life insurance policy on Mr. Barrer's life was still in effect at the time of his death, it is entitled to the entry of judgment in its favor with respect to Plaintiff's complaint for breach of contract and bad faith. Plaintiffs, in turn, submit that there remain numerous genuine issues of material fact as to: (1) whether there was bad faith on behalf of the defendant relative to its procedure in converting and thereafter terminating the policy; (2) whether there was a course of dealing between Plaintiffs and Defendant which constituted bad faith relative to the conversion and termination of the policy; and (3) whether Defendant satisfied its burden of showing that there was ever an effective cancellation of the policy.

■ Pennsylvania law governing the interpretation of insurance policies is now well-settled. Generally speaking,

> The task of interpreting an insurance contract is performed by a court rather than by a jury. The goal of that task is to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Madison Construction Company v. Harleysville Mutual Insurance Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999), quoting *Gene & Harvey Builders v. Pennsylvania Manufacturers Association*, 512 Pa. 420, 426, 517 A.2d 910, 913 (1986) and *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 304–05, 469 A.2d 563, 566 (1983). *See Also: The Travelers Casualty & Surety Company v. Castegnaro*, —— Pa. ——, 772 A.2d 456 (2001); *Bateman v. Motorists Mutual Insurance Co.*, 527 Pa. 241, 590 A.2d 281, 283 (1991). Contractual language is ambiguous if it is reasonably susceptible of different con-

structions and capable of being understood in more than one sense or if it is subject to more than one reasonable interpretation when applied to a particular set of facts. *Madison Construction,* 735 A.2d at 106. A provision of an insurance contract then, is ambiguous if reasonably intelligent persons, considering it in the context of the whole policy, would differ regarding its meaning. *Carey v. Employers Mutual Casualty Company,* 189 F.3d 414, 420 (3rd Cir.1999), citing *State Farm Mut. Auto. Ins. Co. v. Moore,* 375 Pa.Super. 470, 475–76, 544 A.2d 1017, 1019 (1988). The language of an insurance policy should not, however, be tortured to create ambiguities, but should be read to avoid ambiguities, if possible. *Gene & Harvey Builders,* 517 A.2d at 917, citing *Monti v. Rockwood Insurance Co.,* 303 Pa.Super. 473, 450 A.2d 24 (1982). *See Also: Steuart v. McChesney,* 498 Pa. 45, 53, 444 A.2d 659, 663 (1982). What's more, if the language of an insurance policy is clear and unambiguous, an insured does not have a colorable claim against an insurer in the event of a coverage dispute on the basis that he did not read or understand the policy. *Worldwide Underwriters Insurance Co. v. Brady,* 973 F.2d 192, 194 (3rd Cir.1992).

These principles notwithstanding, where the insurer or its agent creates in the insured a reasonable expectation of coverage that is not supported by the terms of the policy, that expectation will prevail over the language of the policy. *Bensalem Township v. International Surplus Lines Insurance Co.,* 38 F.3d 1303, 1311 (3rd Cir.1994). Indeed, Pennsylvania case law dictates that the proper focus for determining issues of insurance coverage is the reasonable expectations of the insured. *Reliance Insurance Company v. Moessner,* 121 F.3d 895, 903 (3rd Cir. 1997), citing *Tonkovic v. State Farm Mutual Automobile Insurance Co.,* 513 Pa. 445, 521 A.2d 920 (1987) and *Collister v.*

*Nationwide Life Insurance Co.,* 479 Pa. 579, 388 A.2d 1346 (1978). In most cases, the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations, although the courts must examine the totality of the insurance transaction involved to ascertain the insured's reasonable expectations. *Id.; Bensalem Township v. International Surplus Lines Insurance Co.,* 38 F.3d 1303, 1309 (3rd Cir.1994). As a result, even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage. *Reliance, supra; Bensalem,* 38 F.3d at 1311. It has therefore been said that the insured's reasonable expectations control, even if they are contrary to the explicit terms of the insurance policy. *Medical Protective Company v. Watkins,* 198 F.3d 100, 106 (3rd Cir.1999).

Applying these principles to the case at hand, we find no contractual ambiguities or misleading representations entitling the plaintiffs to relief here. Rather, we note that the insurance policy at issue clearly and unambiguously outlines what happens in the event that a premium payment is not made. Specifically, the policy reads, in relevant part:

**Payment of Premiums and Grace Period-**All premiums are payable on or before their due dates either at the Home Office (or at such office as the Company may designate) or to an authorized representative of the Company in exchange for a receipt signed by the President or the Secretary of the Company and countersigned by such representative.

The payment of a premium will not maintain this policy in force beyond the next premium due date, except as other-

wise provided. Any premium not paid on or before its due date will be in default.

A grace period of 31 days will be granted for the payment of each premium after the first, during which period the policy will continue in force. If the Insured dies during such period, any unpaid premium will be deducted from the amount otherwise payable under this policy. . . .

The policy further states:

## INSURANCE OPTIONS ON NON-PAYMENT OF PREMIUMS

The insurance options provided below are available if a premium is in default beyond the grace period. The option for Extended Term insurance will be automatically effective if premiums have been paid for at least the number of years for which a period of Extended Term insurance is first shown in the Table on page 6. However, Reduced Paid–Up insurance may be elected, in lieu of Extended Term insurance, within three months after the due date of the premium in default, if premiums have been paid for at least the number of years for which a Reduced Paid–Up insurance value is first shown in the Table on page 6.

### Extended Term Insurance

Under this option, the policy will be continued as non-participating paid-up Extended Term insurance.

For a policy without any paid-up additions, dividend accumulations, or indebtedness, the amount of such insurance will be the Face Amount of Insurance and the term of the insurance, measured from the due date of the premium in default, will be as specified in the Table on page 6.

Otherwise, the amount of such insurance will be the Face Amount of Insurance plus any paid-up additions (including a paid-up addition purchased by any annual divided that is due and has not been otherwise applied) and divided accumulations, and less any indebtedness. The term of this insurance, measured from the due date of the premium in default will be such as the Cash Surrender Value on that date will provide when applied, as a net single premium, at the insured's then attained age.

### Reduced Paid–Up Insurance

Under this option, the policy will, upon written request, be continued as participating paid-up Whole Life insurance for a reduced amount. The reduced amount will be such as the Cash Surrender Value on the due date of the premium in default will provide when applied, as a net single premium, at the Insured's then attained age. Such amount for a policy without any paid-up additions, dividend accumulations, or indebtedness will be as specified in the Table on page 6.

In determining either of these benefits, account will be taken of any loan made or repaid during the grace period of the premium in default, as well as of any paid-up additions or dividend accumulations surrendered or withdrawn during such period.

Thus, as is clear from the foregoing provisions and since there were no paid-up additions, dividend accumulations or indebtedness and since the plaintiffs did not in writing request that the policy be continued as participating paid-up Whole Life insurance, upon the plaintiffs' failure to pay the premium which was due on January 26, 1980, the policy was automatically converted to Extended Term Insurance in

the face amount of $100,000 for a term (under the table on page 6 of the policy) of 15 years and 216 days.

■ According to the plaintiff's affidavits supplied in response to the defendant's motions for sanctions and for summary judgment, she and her husband paid the premiums for the policy after they received premium bills from Met Life indicating the amount of the premium and the date that it was due. They never received a bill for the premium payment that would have been due on January 26, 1980 and, in fact, they never received any further bills or notices from Met Life for the policy after they received the bill for the premium which was due on·January 26, 1979, despite the fact that they had frequent and ongoing contact with their Met Life agent. Mrs. Barrer further states that she would have expected her Met Life agent to have contacted her and explained the change in the policy and its termination because he had always kept her advised as to any changes in her insurance policies in the past. Had he done so, Plaintiff avers, she and her husband would have paid the overdue premiums and taken action to continue or reinstate the policy as a whole life policy. Interestingly then, the plaintiffs here are **not** contending that the policy which they received was something other than that for which they had contracted or which they expected, or that the policy could be read to remain in force until a premium bill was received. Likewise, Mrs. Barrer does not contend that either she or her husband failed to read the policy. Given that the policy is clear and unambiguous and is silent as to whether annual bills would be sent, we conclude that Plaintiffs' expectation was not reasonable and they therefore cannot be afforded any relief under either a theory of contrac-

tual ambiguity or the doctrine of reasonable expectations.

■ Moreover, even accepting the plaintiffs' argument that the policy should have remained unchanged until such time as they received notice of the change, the record reflects that the company **gave** them this notice in its letter of February 2, 1989. Again, in that letter, Met Life clearly informed Plaintiffs: (1) that the premiums had been discontinued after they were paid to January 26, 1980; (2) that under the policy provision which said that if premiums are stopped, any available cash value would be used to automatically continue the policy in benefit as Paid–Up Term Insurance, the policy had been continuing in benefit for $102,880 of Paid–Up Term Insurance; and (3) that $102,880 was the amount which would be paid if the insured (Mr. Barrer) died before December 11, 1996. Finally, this letter also advised that the policy then had a cash surrender value of $33,674.68.

■ However, despite this notice and the policy language regarding reinstatement, there is no evidence on this record that the plaintiffs ever did anything (before filing this lawsuit) to challenge the automatic conversion of the policy to paid-up Term Insurance or to have it reinstated as a whole life policy. Indeed, it appears that the plaintiffs made no further efforts to contact Met Life at all until after Mr. Barrer's death in 1998, some two years after the policy had expired. There simply is no evidence here that either the insurer or its agent in this case created in the insured a reasonable expectation of coverage that is not supported by the terms of the policy. Accordingly, we find that no genuine issues of material fact exist as to whether the plaintiffs had life insurance coverage through Met Life when Mr. Barrer died in February, 1998 or as to

whether the defendant company instilled in them the reasonable expectation that such coverage still existed. On this record, there clearly was no such coverage at that time and no reasonable expectation of coverage. For these reasons, the defendant is entitled to the entry of judgment in its favor as a matter of law on both of the plaintiffs' claims for bad faith and breach of contract.[2]

An order follows.

## ORDER

AND NOW, this 16th day of July, 2001, upon consideration of Defendant's Motion for Summary Judgment and Plaintiffs' Response thereto, it is hereby ORDERED that the Motion is GRANTED and judgment is entered in favor of Defendant as a matter of law on all counts of the Plaintiffs' Complaint.

---

**2.** The term "bad faith" includes "any frivolous or unfounded refusal to pay proceeds of a policy." For purposes of an action against an insurer for failure to pay a claim, such conduct imparts a dishonest purpose and means a breach of a known duty, (i.e., good faith and fair dealing) through some motive of self interest or ill will. Mere negligence or bad judgment is not bad faith. *Keefe v. Prudential Property and Casualty Ins. Co.*, 203 F.3d 218, 225 (3rd Cir.2000); *Krisa v. The Equitable Life Assurance Society*, 113 F.Supp.2d 694, 702 (M.D.Pa.2000). There-

fore, in order to recover under a bad faith claim, a plaintiff must show (1) that the defendant did not have a reasonable basis for denying benefits under the policy; and (2) that the defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Krisa*, 113 F.Supp.2d at 703.

In light of the facts outlined above, we must further conclude that Defendant Met Life is entitled to the entry of judgment in its favor as a matter of law on Plaintiffs' claim for bad faith under 42 Pa.C.S. § 8371.