

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-13-2007

# West v. Lincoln Benefit

Precedential or Non-Precedential: Precedential

Docket No. 06-3491

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"West v. Lincoln Benefit" (2007). *2007 Decisions*. Paper 7.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/7

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 06-3491

———

PATRICIA WEST,

Appellant

v.

LINCOLN BENEFIT LIFE COMPANY

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 05-cv-00561)
District Judge:  Honorable Donetta W. Ambrose

———

Argued May 16, 2007
Before:  FISHER and ROTH, *Circuit Judges*,
and RAMBO,[*] *District Judge*.

———

[*]The Honorable Sylvia H. Rambo, United States District
Judge for the Middle District of Pennsylvania, sitting by
designation.

(Filed: December 13, 2007)

John W. Jordan, IV (Argued)
Matis, Baum, Rizza & O'Connor
444 Liberty Avenue
Four Gateway Center, Suite 300
Pittsburgh, PA  15222
      *Attorney for Appellant*

Alan H. Abes (Argued)
Dinsmore & Shohl
255 East Fifth Street
1900 Chemed Center
Cincinnati, OH  45202

R. Stanley Mitchel
Rose, Schmidt, Hasley & DiSalle
900 Oliver Building
Pittsburgh, PA  15222-5369
      *Attorneys for Appellee*

———

OPINION OF THE COURT

———

RAMBO, *District Judge*.

This matter arises out of a dispute over whether a policy for life insurance was in force upon the death of James West, Jr. The insurer, Appellee Lincoln Benefit Life Company ("Lincoln

2

Benefit"), argues that Mr. West's policy had lapsed for nonpayment of premiums and had not been reinstated. Because the policy was not in force at the time of Mr. West's death, Lincoln Benefit submits, it is not obligated to pay benefits under the policy terms. Appellant Patricia West, James West's wife and beneficiary of the policy, argues that Pennsylvania law imposed a temporary contract of insurance when, after notice of lapse, she sent an application for reinstatement and payment of overdue premiums. For the reasons that follow, we agree with Lincoln Benefit and will affirm summary judgment in its favor.

I.

On April 4, 1998, Mr. West obtained a life insurance policy from Allstate Insurance Company. On the application for the policy, he stated that he was taking medicine for high blood pressure. After medical testing or examination by Allstate, the insurance policy was issued. In February 2002, Mr. West converted the Allstate policy to a $50,000 term policy with Lincoln Benefit and added a $50,000 term rider benefit ("the Policy"). At the time of conversion, Lincoln Benefit did not require a medical examination or other proof of insurability. Mr. West named Mrs. West beneficiary of the Policy.

The Policy terms are as follows: the insured must remit a quarterly payment of $228.51 to remain insured. If a premium payment is not received by its due date, a grace period of sixty-one days goes into effect. At the end of sixty-one days, if the premium is still outstanding, the Policy is terminated. After termination but before the death of the insured, however, the Policy may be reinstated provided that the insured: 1) requests

reinstatement within five years of the date that the Policy entered the grace period; 2) gives Lincoln Benefit "the proof [it] require[s] that the insured is still insurable" in the payment class under which the Policy was issued; 3) pays an amount large enough to cover the unpaid monthly deductions for the grace period; 4) makes a payment sufficient to keep the policy in force for three subsequent policy months; and 5) pays or asks Lincoln Benefit to reinstate any outstanding loan, with interest. (R. at 60a.)

Lincoln Benefit addressed all correspondence to Mr. West at his home address. Mr. West would open the mail addressed to him, then give Mrs. West any mail that required a response, including bills and notices of payment due issued by Lincoln Benefit. Mrs. West would respond or write a check for payment, as appropriate, and maintain the file of insurance documents. Mrs. West recalled two occasions when Mr. West gave her a notice from Lincoln Benefit that the premium payment was overdue and coverage would terminate unless payment was made by a particular date. Both times she sent a check immediately to continue the policy in force. She saw only the correspondence from Lincoln Benefit that Mr. West gave to her. She does not know if there were letters or bills from Lincoln Benefit sent to her husband that he did not then pass on to her. The Wests paid all premiums due through February 17, 2004.

On April 1, 2004, Lincoln Benefit sent Mr. West a reminder that his next premium was due on May 1, 2004. On May 3, 2004, because it had not received payment, Lincoln Benefit sent Mr. West a letter informing him that the Policy had

4

entered the grace period. His Policy would terminate on July 3, 2004 if the premium was not received on or before that date. On May 11, 2004, Lincoln Benefit sent Mr. West a second notice that his May premium was due.[1]

Mr. West did not submit payment to Lincoln Benefit on or before July 3, 2004. Thus, on July 5, 2004, Lincoln Benefit sent him a letter stating that the grace period for premium

---

[1]According to Lincoln Benefit's records, Mr. West was sent eleven reminder letters substantially identical to the one he received on May 3, 2004. He was sent six second notices of payment due, like the one he received on May 11, 2004. Janet Dever, a Claim Consultant for Allstate Life Insurance Company with authority to act for Lincoln Benefit, submitted an affidavit in support of Lincoln Benefit's motion for summary judgment. She averred that the correspondence described in this opinion was sent to Mr. West in due course of business for Lincoln Benefit on or about the date reflected on each item. Mrs. West testified that she never saw any of this correspondence (aside from the two times she admits to having seen similar notices) and therefore denies that Lincoln Benefit sent these letters. In the alternative, she claims that her husband never received them. Mrs. West admits, however, that she is without knowledge as to whether Mr. West received these letters. Mrs. West's admitted lack of knowledge is insufficient to rebut the presumption that correspondence mailed in the ordinary course of business is received. *See West v. Lincoln Benefit Life Co.*, No. 05-561, 2006 WL 1788384, at *7 (W.D. Pa. June 26, 2006); Fed. R. Civ. P. 56(e).

payment on his policy had expired. The letter advised Mr. West that he could apply for reinstatement. The second paragraph of the letter stated, "[t]o continue your valuable coverage, complete the Application for Reinstatement form on the back and return it with your payment of $228.51. Upon underwriting approval, and receipt of the sufficient payment, coverage will continue uninterrupted." (R. at 183a.) Enclosed with the letter was an application for reinstatement. The application itself states, "I (each undersigned) request that the Company reinstate this policy. . . . Coverage will not start again until this request is approved by the company and all required premiums and interest are paid. If this request is not approved, any amount tendered will be returned." (*Id.* at 187a.)

Mrs. West recalls having read only the first sentence of the second paragraph of the letter, "[t]o continue your valuable coverage, complete the Application for Reinstatement form on the back and return it with your payment of $228.51." She interpreted it to mean that if she filled out the form and sent it to Lincoln Benefit with payment, Mr. West's insurance would be reinstated. Mrs. West did not read, or does not remember reading, any of the language in the letter or the application stating that underwriting approval was required before reinstatement would be effective.

The application asked ten questions regarding the applicant's medical history. Mrs. West filled out the application on Mr. West's behalf. She answered nine questions in the negative, indicating that Mr. West had no medical issues relating to those questions. She answered "yes" and "no" to one question – whether, in the past ten years or during the time Mr.

6

West was insured under the Policy, he had been "diagnosed with, sought or received treatment or advice for: heart attack, disease of coronary arteries or other blood vessels, other heart disorder, high blood pressure, diabetes or stroke." (*Id.*) In the blank provided for an explanation of "full details, including diagnosis, severity, treatment, name and address of doctors, hospitals, and clinics," she wrote "controlled with medication." (*Id.*) She answered "yes" because Mr. West still had the high blood pressure disclosed on his initial application for life insurance with Allstate. She knew Mr. West to be in good health because he was taking medication to control his blood pressure and he had recently passed a physical exam with no medical problems. Thus, she believed that Lincoln Benefit would approve the application for reinstatement immediately upon receipt of the application and payment.

Lincoln Benefit received the application for reinstatement on July 15, 2004, along with Mr. West's check for $228.51. On July 19, 2004, Lincoln Benefit deposited the check pursuant to its standard practice.

Mr. West died on July 24, 2004, and Lincoln Benefit received notice of his death two days later. The Underwriting Department had not completed its review of the application and had not made a decision on whether to reinstate his Policy. Because Lincoln Benefit did not consider Mr. West's Policy to be in effect at the time of his death, on July 30, 2004, the company denied Mrs. West's claim for payment of benefits and refunded the premium payment of $228.51 that had accompanied the application for reinstatement.

7

II.

The District Court had subject matter jurisdiction to hear this claim pursuant to 28 U.S.C. § 1332(a)(1). We have jurisdiction to review the District Court's decision on summary judgment under 28 U.S.C. § 1291. We review the decision *de novo*. *State Farm Mut. Auto. Ins. Co. v. Rosenthal*, 484 F.3d 251, 253 (3d Cir. 2007).

Because subject matter jurisdiction is based on diversity of citizenship, we look to the substantive law of Pennsylvania to determine the rights and obligations of the parties. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77 (1938). The law of the Commonwealth is declared by "its Legislature in a statute or by its highest court." *Id.* The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, we "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is. *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661, 663 (3d Cir. 1980); *see also Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967). We may not rest on "blind adherence to state precedents without evaluating the decisions in light of other relevant data as to what the state law is." *McKenna*, 622 F.2d at 663 (quotation and alteration omitted); *accord Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir. 1996); *cf. Bernhardt v. Polygraphic Co. of Am., Inc.*, 350 U.S. 198, 204 (1956) (affirming district court's use of forty-five-year-old state supreme court precedent when "there appear[ed] to be no

confusion in [state] decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of [state] judges on the question, [and] no legislative development that promises to undermine the judicial rule"). Opinions from inferior Pennsylvania courts are not controlling in our analysis, but they are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise. *Rosenthal*, 484 F.3d at 253.

## III.

The facts of this case implicate a specific area of insurance law – reinstatement of a lapsed policy of life insurance – and general principles of insurance law as declared by the Pennsylvania courts. We will address each paradigm in turn.

### A. The Law of Reinstatement

Pennsylvania's Insurance Department Act of 1921 was enacted to protect the insurance-buying public. *Collister v. Nationwide Life Ins. Co.*, 388 A.2d 1346, 1355 (Pa. 1978). One of its requirements is that all life insurance policies delivered in Pennsylvania contain the consumer-protective provisions of 40 Pa. Cons. Stat. Ann. § 510, or terms more favorable to the insured. *See generally* Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 33.48 (3d ed. 1995) ("[W]here statutory requirements are enacted, they automatically become part of any insurance policy issued thereafter, notwithstanding more limiting language in the policy."). The statute requires that all

9

premiums may be paid in advance, § 510(a), and if a premium is not received when due, the insured is entitled to a grace period in which to pay, § 510(b). If an insured does not pay within the grace period and the policy lapses, § 510(k) governs the rights and obligations of the insured after lapse of a policy, should the insured wish to apply for reinstatement:

> [T]he holder of a policy shall be entitled to have the policy reinstated, upon written application therefor, [1] at any time within three years from the date of default in premium payments, unless the policy has been duly surrendered or the extension period expired, [2] upon the production of evidence of insurability satisfactory to the company, . . . [3] payment of all overdue premiums with interest at a rate to be specified in the policy . . . and [4] the payment of any other indebtedness to the company upon said policy with interest . . . .

§ 510(k).

The conjunctive phrasing of § 510(k) makes it clear that each requirement must be satisfied – mere payment of overdue premiums is not sufficient to effect reinstatement. *Fisher v. Am. Nat'l Ins. Co.*, 241 F.2d 175, 177 (3d Cir. 1957); *Sykes v. United Ins. Co.*, 76 A.2d 227, 229 (Pa. Super. Ct. 1950); *Selby v. Equitable Beneficial Mut. Life Ins. Co.*, 17 A.2d 696, 697 (Pa. Super. Ct. 1941); *Peters v. Colonial Life Ins. Co. of Am.*, 193 A. 460, 463 (Pa. Super. Ct. 1937); *Stager v. Fed. Life Ins. Co.*, 189 A. 776, 778 (Pa. Super. Ct. 1937); *Fishman v. Eureka-Md.*

10

*Assurance Corp.*, 183 A. 98, 102 (Pa. Super. Ct. 1936); Franklin L. Best, Jr., Pennsylvania Insurance Law § 13.7 (3d ed. 2005); *see* Russ & Segalla, *supra*, § 33.46 ("Where two or more conditions to reinstatement exist, it is necessary that the insured satisfy all of the conditions in order to obtain reinstatement . . . ."). The insured holds the burden of proving compliance with all conditions precedent to reinstatement. *Riebel v. Prudential Ins. Co. of Am.*, 179 A. 447, 448 (Pa. 1935); *Sykes*, 76 A.2d at 229; *Selby*, 17 A.2d at 697-98; *Peters*, 193 A. at 464; *Stager*, 189 A. at 779; *Fishman*, 183 A. at 101. Because our analysis turns on the second requirement, that the insured must provide evidence of insurability satisfactory to the insurer, we will evaluate the law on that issue only.

The Pennsylvania Supreme Court was presented with an opportunity to interpret the meaning of "evidence of insurability satisfactory to the insurer" in *Riebel*. A man applied for life insurance and received a policy. 179 A. at 447. The policy lapsed for non-payment of premiums. *Id.* The reinstatement provision in *Riebel* was phrased in exact accordance with the statutory text of § 510(k) that was then in effect, such that the lapsed insured was required to pay past arrears and furnish evidence of insurability satisfactory to the insurer. *Id.* at 447-48. The lapsed insured submitted his application for reinstatement and payment of past-due premiums. *Id.* He also submitted a physician's report of his health indicating that he had lost twenty pounds, looked anemic, had contracted the flu during the previous year and had not felt well since. *Id.* at 448. The next day, he died. *Id.* Four days later, and without notice of the lapsed insured's death, the application for reinstatement was denied because the evidence presented did not satisfy the

11

company that he was still insurable. *Id.* The arrearage payment was tendered back to the estate of the lapsed insured. *Id.*

The Pennsylvania Supreme Court held that the insurer was clearly within its rights to deny reinstatement under the statutory predecessor to § 510(k), the insurance policy, and the application for reinstatement, when no satisfactory evidence of the insurability of the lapsed insured was provided.[2] *Id.*; *see* Best, *supra*, § 13.7; Russ & Segalla, *supra*, § 33:61 ("[R]einstatement may be denied if the insured is uninsurable at the time he or she seeks reinstatement . . . ."). "[E]ven if the court could overlook the contractual and statutory requirement, that 'the evidence of the insurability of the insured [must be] satisfactory to the Company,' . . . plaintiff has furnished no evidence which would justify either the court or jury in so determining on [this] unsatisfactory proof . . . ." *Riebel*, 179 A. at 448. Accordingly, the Supreme Court affirmed entry of judgment for the insurance company and against the beneficiary of the lapsed insurance policy. *Id.*

---

[2]An earlier case held that even when an insurance company *approved* an application for reinstatement after the applicant had died, the company was not liable for death benefits. *Meerbach v. Metro. Life Ins. Co.*, 46 Pa. Super. 133, 1911 WL 4460, at *1 (Pa. Super. Ct. Dec. 19, 1910). The court held that the posthumous approval "would operate to revive the policy on a life which had then ceased to exist. No such thing could have been contemplated by either the company or the insured." *Id.*

12

As demonstrated by *Riebel*, evidence of insurability satisfactory to the company must, in fact, be satisfactory to the company. If this evidence is not provided, or is not satisfactory, the insurer need not reinstate. *Id.*; *Stager*, 189 A. at 778; Russ & Segalla, *supra*, § 33:61. The insurer "cannot be arbitrary or capricious in considering the evidence of insurability" provided in an application for reinstatement. *Rothschild v. N.Y. Life Ins. Co.*, 162 A. 463, 466 (Pa. Super. Ct. 1932). Ultimately, however, the insurer has the right to make the final decision as to whether it will accept or deny an application for reinstatement. *Fishman*, 183 A. at 102; *see* § 510(k) (evidence of insurability must be satisfactory to the insured).

The method of proof of insurability may vary. Insurers often rely initially on forms to provide evidence of insurability. These forms require the insured or an examining physician to answer questions about the insured's health. *See Stager*, 189 A. at 778. Incomplete or non-responsive answers to the insurer's questions do not provide satisfactory evidence of insurability. *Id.* at 778-79. In *Stager*, such a form was used in an application for reinstatement. The application asked, "Have you now any diseases or disorders? If any, give details." *Id.* at 778. The lapsed insured responded "Bladder." *Id.* The insurer replied with the following: "If that question is answered correctly and [the insured] now has a bladder disorder he would not be insurable. We are returning the application for him to modify if that question is incorrectly answered." *Id.* This answer, unchanged, imposed no obligation upon the insurer to reinstate because it was not responsive to the question asked and did not provide satisfactory evidence that the lapsed insured remained insurable. *Id.* at 779.

13

B.  Subsequent Developments in Insurance Law

In the late 1970s, the Pennsylvania Supreme Court issued decisions that demonstrated its consumer-oriented approach to insurance law by allowing the expectations of the insured rather than the plain terms of a policy to control insurance disputes. None of these decisions involved reinstatement of a lapsed policy; none purport to interpret or modify the law governing reinstatement described *supra*.

In *Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366 (Pa. 1977) (plurality), the plaintiff-beneficiary claimed negligent misrepresentation by an insurer's agent. *Id.* at 367. The agent informed the insured that upon his death, his policy would pay the remainder of his mortgage balance plus $5,000. *Id.* The terms of the policy did not, in fact, contain such provisions. *Id.* The Rempels did not read the policy to confirm the agent's assertions, but the Pennsylvania Supreme Court did not impose a duty upon them to do so. *Id.* at 368. Instead, "[c]onsumers, such as the Rempels, view an insurance agent . . . as one possessing expertise in a complicated subject. It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself." *Id.* Put another way, consumers rely on an agent to "translate" the specialized language of an insurance policy into words that they understand. *Id.*; *accord Collister*, 388 A.2d at 1353 ("[T]he insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of

14

the insured's lack of understanding . . . ."). Because there was "no evidence . . . indicating that the Rempels knew, or should have known, that the policy which they received did not contain the provisions which [the agent] led them to believe would be in the policy," the Rempels were entitled to the additional $5,000 that they reasonably expected as a result of the agent's misrepresentation. *Rempel*, 370 A.2d at 369.

A year later, in *Collister*, the Pennsylvania Supreme Court considered the question of whether a temporary contract of insurance arose when a proposed insured submitted a new application for insurance and contemporaneously paid his first premium. 388 A.2d at 1347-48. The insurance agent who received the application and payment informed the proposed insured that a medical examination was required. *Id.* at 1355. The agent also provided the proposed insured a "conditional receipt" which stated "NO INSURANCE WILL BECOME EFFECTIVE PRIOR TO POLICY DELIVERY UNLESS THE ACTS REQUIRED BY THIS RECEIPT ARE COMPLETED." *Id.* at 1356. One of the acts required was a medical examination demonstrating the applicant's insurability. *Id.* The applicant died before submitting the results of a medical exam. *Id.* at 1347. The insurer had not accepted or rejected his application for a new policy. *Id.* The beneficiary claimed that a temporary contract for insurance had arisen at the moment of premium payment. *Id.* at 1348. The Pennsylvania Supreme Court agreed. *Id.* at 1355.

The Court held that "the proper resolution of questions such as that presented by the instant appeal depends upon an

15

analysis of the totality of the transaction involved." *Id.* at 1353. It further held that

> [i]n situations where the circumstances of the transaction do not indicate that the insurer intended to provide interim insurance, but nevertheless show that the insurer accepted payment of the first premium at the time it took the application, it is then up to the insurer to establish by clear and convincing evidence that the consumer had no reasonable basis for believing that he or she was purchasing immediate insurance coverage.

*Id.* Ultimately, courts were directed to "examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer" and give effect to those expectations, regardless of the ambiguity or clarity of the language of an insurance contract. *Id.* at 1353-54.

Following *Rempel* and *Collister*, however, insurance case law appeared to diverge under two subsequent decisions by the Pennsylvania Supreme Court: *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 469 A.2d 563 (Pa. 1983), and *Tonkovic v. State Farm Mutual Automobile Insurance Co.*, 521 A.2d 920 (Pa. 1987). *Standard Venetian Blind* adhered to the language of the insurance contract to determine an insurer's obligation to pay, without regard to the expectations of the insured. It did not cite *Collister*. Instead, the Pennsylvania Supreme Court stated that the intent of the parties is

16

manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. In the absence of proof of fraud, failure to read the contract is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.

*Standard Venetian Blind*, 469 A.2d at 566 (quotation, citations, and alterations omitted). *Standard Venetian Blind* did admonish that "in light of the manifest inequality of bargaining power between an insurance company and a purchaser of insurance, a court may on occasion be justified in deviating from the plain language of a contract of insurance." *Id.* at 567.

The facts of that case, however, did not permit such deviation because the policy limitation at issue was clearly worded and conspicuously displayed. *Id.* The insured, upon application for the policy, requested "full coverage on everything we have." *Id.* at 565. The policy contained standard exclusion provisions, which were clear, unambiguous, and not contrary to law. *Id.* at 566. The insurer did not describe the limitations of the policy, but neither did it misrepresent that the policy had no exclusions or that the exclusions were anything other than what they purported to be. *See id.* To allow the insured "to avoid application of the clear and unambiguous

17

policy limitations in these circumstances would [have required the Supreme Court] to rewrite the parties' written contract," which the court would not do. *Id.* Instead, it sought to "accord proper significance to the written contract, which has historically been the true test of parties' intentions." *Id.* at 567.

By contrast, *Tonkovic* focused on the reasonable expectations of the insured rather than the clear language of the contested policy because the insured specifically requested disability insurance, but was issued a policy that did not include disability insurance. 521 A.2d at 924. *Tonkovic* held that where "an individual applies and prepays for specific insurance coverage, the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change, regardless of whether the insured read the policy." *Id.* at 925. There is "a crucial distinction between cases where one applies for a specific type of coverage and the insurer unilaterally limits that coverage, resulting in a policy quite different from what the insured requested," as the facts of *Tonkovic* demonstrated, and "cases where the insured received precisely the coverage that he requested but failed to read the policy to discover clauses that are the usual incident of the coverage applied for," as occurred in *Standard Venetian Blind*. *Id.*; *accord Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 13 (Pa. Super. Ct. 2004) (affirming that an insurer has a duty to inform an insured that it issued a policy different from what the insured requested).

The cases that follow reflect the *Tonkovic* distinction. In the absence of an affirmative misrepresentation by the insurer or its agent about the contents of the policy, the plain and

18

unambiguous terms of a policy demonstrate the parties' intent and they control the rights and obligations of the insurer and the insured. *E.g.*, *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006); *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) ("The polestar of our inquiry . . . is the language of the insurance policy."); *Gene & Harvey Builders, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986). When a provision of the policy is clear and unambiguous, it must be enforced. *Madison Constr. Co.*, 735 A.2d at 106. An unclear, ambiguous provision will be construed against the insurer and in favor of the insured. *Id.*

An analysis of the reasonable expectations of the insured is rightly employed when a claimant alleges that the insurer engaged in deceptive practices toward the insured, either to misrepresent the terms of the policy or to issue a policy different than the one requested by the insured and promised by the insurer. *Matcon Diamond, Inc. v. Penn Nat'l Ins. Co.*, 815 A.2d 1109, 1114 (Pa. Super. Ct. 2003); *Pressley v. Travelers Prop. Cas. Corp.*, 817 A.2d 1131, 1140 (Pa. Super. Ct. 2003). In this context, the clear and unambiguous language in the policy is one aspect of the totality of the circumstances that may lead to the reasonable expectations of the insured. *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998); *Frain v. Keystone Ins. Co.*, 640 A.2d 1352, 1354 (Pa. Super. Ct. 1994); *see Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 903 n.7 (3d Cir. 1997); *Pressley*, 817 A.2d at 1143 (Lally-Green, J., concurring and dissenting); *but see Dibble v. Sec. of Am. Life Ins. Co.*, 590 A.2d 352, 355 (Pa. Super. Ct. 1991) (evaluating "the dynamics of the transaction viewed in its

19

entirety" without regard to the language of an application for a new policy or the policy itself); *Bierer v. Nationwide Ins. Co.*, 461 A.2d 216, 221 (Pa. Super. Ct. 1983) ("The fact that the policy rider and application are unambiguous in their provisions does not, by itself, defeat the reasonable expectations of the consumer."). "[A]n insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous." *Frain*, 640 A.2d at 1354. However, "even the most clearly written exclusion will not bind the insured where the insurer or its agent has created in the insured a reasonable expectation of coverage." *Reliance Ins. Co.*, 121 F.3d at 903. "[M]ere assertions that a party expected coverage will not ordinarily defeat unambiguous policy language excluding coverage." *Matcon Diamond, Inc.*, 815 A.2d at 1115.

We believe that this synthesized standard is the truest statement of Pennsylvania law. We have applied it in the past, *Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 136-37 (3d Cir. 2005); *Reliance Ins. Co.*, 121 F.3d at 903; *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994); *see Altimari v. John Hancock Variable Life Ins. Co.*, 247 F. Supp. 2d 637, 644-45 (E.D. Pa. 2003); *Barrar v. Metro. Life Ins. Co.*, 151 F. Supp. 2d 617, 621-22 (E.D. Pa. 2001), and we will apply it here.

IV.

The parties have asked us to determine which source of law determines their rights and obligations to one another: the law governing reinstatement or the law governing the reasonable

20

expectations of the insured. Considering the evolution of the case law under the "reasonable expectations" standard, we believe that the outcome of this matter is the same no matter which law we choose. Lincoln Benefit is not obliged to pay benefits on Mr. West's lapsed Policy.

## A. Under the Law of Reinstatement

We believe that the Pennsylvania Supreme Court would decide this matter under 40 Pa. Cons. Stat. Ann. § 510(k), its interpretive precedent, and the reinstatement terms of the Policy. The burden of proving compliance with all conditions precedent to reinstatement of the Policy is thus on Mrs. West. *See, e.g.*, *Sykes*, 76 A.2d at 229. She cannot meet this burden. Both the case law and the Policy are clear: payment of the overdue premium was insufficient to effect reinstatement. It was incumbent upon Mr. West to give Lincoln Benefit the proof it required that he was still insurable. (R. at 60a); *see* § 510(k) (requiring a lapsed insured to produce "evidence of insurability satisfactory to the company.").

Lincoln Benefit had the right, statutorily and under the terms of the Policy, to decide whether the evidence provided by the Wests was satisfactory proof of Mr. West's insurability. *See Riebel*, 179 A. at 448; *Fishman*, 183 A. at 102. At the time of his death, the Underwriting Department had not decided whether the statements on the application provided satisfactory evidence of insurability. Mrs. West does not argue that Lincoln Benefit was arbitrary, capricious, or even unreasonable in not deciding the merits of the application for reinstatement within eleven days of its receipt. Thus, reinstatement was not effected because

21

Lincoln Benefit had not yet accepted his application.[3] Mr. West was not insured at the time of his death and Lincoln Benefit is not contractually obligated to pay benefits.[4]

_____

[3]Even if Lincoln Benefit had evaluated the information on the application, the information would not have provided satisfactory proof of Mr. West's continued insurability. The application asked, in the past ten years or for the time during which Mr. West was insured under the Policy, whether he had been "diagnosed with, sought or received treatment or advice for: heart attack, disease of coronary arteries or other blood vessels, other heart disorder, high blood pressure, diabetes, or stroke." Mrs. West's answers of both "yes" and "no" are conflicting in themselves. Moreover, when asked for "full details, including diagnosis, severity, treatment, name and address of doctors, hospitals, and clinics," she wrote "controlled with medication." Her answer was not responsive to the question asked and did not provide the additional details requested by Lincoln Benefit to assist the company in determining Mr. West's continued insurability. Even if Lincoln Benefit had reviewed the application, Mrs. West's answer would have been insufficient for immediate reinstatement. *See Stager*, 189 A. at 778-79.

[4]We are urged to apply the specific holding in *Collister*, such that by accepting the Wests' payment of $228.51 before deciding whether to reinstate, a temporary contract of insurance arose between Lincoln Benefit and Mr. West that Lincoln Benefit may not now disclaim. *See* 388 A.2d at 1355. Nothing about *Collister* itself or subsequent case law suggests that

22

B.  Under the Law of the Reasonable
Expectations of the Insured

Mrs. West argues, however, that her expectation that coverage would exist upon submission of the application and

_____

temporary insurance may arise when an application for *reinstatement* rather than a *new policy* is pending.  None of the cases cited by the majority or the dissent in *Collister* speak to reinstatement.  Commentators discuss contracts for temporary insurance coverage in the context of new policies only.  *Compare* Russ & Segalla, *supra*, § 13.1 *and* Peter Nash Swisher, *Insurance Binders Revisited*, 39 Tort Trial & Ins. Prac. L.J. 1011, 1024-25 (2004) *with* Best, *supra*, § 13.7 *and* Russ & Segalla, *supra*, §§ 33:1-33:119.  An entirely different legal structure applies to applications for reinstatement.  Neither commentators nor courts conflate the two.

The clear difference is that statutory and contractual obligations, described *supra*, govern an application for reinstatement and simply do not apply to an application for a new policy.  Upon lapse of an insurance policy, the contractual provisions governing reinstatement remain in force until the allotted time to apply for reinstatement has passed.  *Rothschild*, 162 A. at 466.  Thus, any action taken toward reinstatement must comply with the contractual or statutory terms that continue to be in effect.  *Id.*; *see* § 510(k); Best, *supra*, § 13.7; Russ & Segalla, *supra*, § 33.8 (whether the insured has a right to reinstate a policy "is determined from the contract of insurance" or pertinent statute).

23

payment should control the outcome.[5]  Under the reasonable expectations analysis, Mrs. West "may not complain that [her] reasonable expectations were frustrated by policy limitations which are clear and unambiguous." *See Frain*, 640 A.2d at 1354.  The reinstatement provision, described above, is clear and unambiguous as to the conditions precedent to reinstatement.  It is also clear that those conditions were not met.

Yet even the most clearly-written policy limitation will not bind Mrs. West if Lincoln Benefit misrepresented the terms and conditions under which reinstatement would be effected and created a reasonable expectation that coverage would be immediate.  The only communication from Lincoln Benefit to the Wests on the topic of reinstatement was by letter.  If Lincoln Benefit, in those letters, created a reasonable expectation that Mr. West would be insured immediately upon payment of the

---

[5]We have very little direct information as to what the insured, Mr. West, expected regarding reinstatement or whether he expected anything at all.  It is unknown whether he read the Policy.  All correspondence from Lincoln Benefit was addressed to him, which he then gave to his wife to handle.  Pennsylvania courts appear to have allowed the beneficiary's expectations to inform the court's decision on what the insured expected, *see Bierer*, 461 A.2d 216, and it appears that Mr. and Mrs. West spoke about the matters herein discussed.  We will allow Mrs. West's perspective to inform our decision on what Mr. West expected.

past-due premium, Lincoln Benefit would be required to pay benefits.[6]

In the reasonable expectations analysis, the insurer must demonstrate that the insured did not have a reasonable expectation of coverage. *Tonkovic*, 521 A.2d at 922, 925; *Bensalem Twp.*, 38 F.3d at 1311. Although *Collister* requires this showing by clear and convincing evidence, 388 A.2d at 1355, *Tonkovic* expressly approved a jury charge instructing that the insurer must show a mere preponderance, 521 A.2d at 922, 925. Because it is the heavier burden, we will proceed under the

---

[6]Mrs. West argues that she and Mr. West expected coverage to start immediately upon submitting payment for the overdue premium because there was no reason to believe that his application would be denied. The Wests knew that Mr. West disclosed both his high blood pressure and the medicine he was taking to control it on his initial application for life insurance. He received a physical exam within six to eight months before the Wests filed the application for reinstatement and his blood pressure was fine. According to Mrs. West, "I just assumed that since I sent the money that [the Policy] would have been reinstated because nothing had changed as far as his health . . . ." (West Dep. 55:18-56:3.) This subjective belief is not pertinent to our evaluation of their expectations of insurance coverage, however. Pennsylvania courts look only to whether the insurer created in the insured a reasonable expectation of coverage, not whether the insured came to an independent conclusion that coverage existed or would exist. *Matcon Diamond, Inc.*, 815 A.2d at 1115.

25

*Collister* evidentiary standard. When the party moving for summary judgment bears the burden of proving certain facts by clear and convincing evidence, we must evaluate the facts in support of the motion in light of that evidentiary burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Accordingly, we must determine, here, whether Lincoln Benefit has shown with convincing clarity that the Wests did not have a reasonable expectation that insurance coverage would restart immediately upon remittance of payment or whether Mrs. West has come forward with sufficient evidence to defeat that showing. *See id.*; *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 237-38 (3d Cir. 2007). Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 248; *El*, 479 F.3d at 238.

The chronology of correspondence between Lincoln Benefit and Mr. West demonstrates that the Wests did not have a reasonable expectation of immediate coverage upon submission of the application for reinstatement and payment of the overdue premium. Lincoln Benefit sent Mr. West notices of payment approximately one month before each premium was due. On eleven occasions, when the premium was not received by its due date, Lincoln Benefit sent follow-up letters stating that his policy value was insufficient to cover the costs of his insurance. These letters requested payment of the overdue premium as soon as possible. They noted that without the premium payment, his Policy would terminate. On six occasions, when the Wests still did not remit payment, Lincoln Benefit sent a second notice of payment due. Each second notice asked again for payment of the premium. Because the

26

Policy was in grace period, the only necessary action to keep the Policy in effect was to pay the overdue premium.

On April 1, 2004, Lincoln Benefit sent Mr. West a notice of payment due informing him that his quarterly premium payment was due on May 1, 2004. The premium was not paid by that date. On May 3, 2004, Lincoln Benefit sent a follow-up letter like the ones described above, informing him that his Policy would terminate on July 3, 2004, if his premium was not paid. It asked him to submit payment as soon as possible, preferably within ten days. On May 11, 2004, Lincoln Benefit sent Mr. West a second notice of premium due.

On July 5, 2004, Lincoln Benefit sent Mr. West a letter stating that "[t]he grace period for premium payment on your policy has expired." (R. at 183a.) It advised that Mr. West could apply for reinstatement. The letter stated, "[t]o continue your valuable coverage, complete the Application for Reinstatement form on the back and return it with your payment of $228.51. Upon underwriting approval, and receipt of the sufficient payment, coverage will continue uninterrupted." (*Id.*) Mr. West showed Mrs. West the document. Mrs. West read only the first sentence of the excerpt quoted and interpreted the language "to continue your valuable coverage" to mean "to continue [uninterrupted] your valuable coverage" rather than "to [restart after cessation] your valuable coverage." (West Dep. 43:24-44:2); *see* Webster's 3d New Int'l Dictionary 493 (1981). She thought that if she "filled out the form and sent in the money, the policy would continue." (West Dep. 45:2-4.) Mrs. West did not read, or does not remember reading, the language

27

in the letter clearly stating that underwriting approval of the application was a condition precedent to reinstatement.

Mrs. West then turned to the application on the reverse of the letter. She filled out the blanks at the top for the policy number and the name of the insured. She then read and answered questions below regarding Mr. West's health. She did not read the paragraph immediately below the blanks for the policy number and the name of the insured that she filled out, and immediately above the questions that she read and answered, which stated, "I (each undersigned) request that the Company reinstate this policy. . . . Coverage will not start again until this request is approved by the company and all required premiums and interest are paid. If this request is not approved, any amount tendered will be returned." (R. at 187a.)

Lincoln Benefit did not misrepresent the conditions precedent to reinstatement. The text of the letter and of the application clearly state that underwriting approval by Lincoln Benefit was required before coverage would begin again. This statement is entirely consistent with the clear language of the Policy itself and the statute, *supra*, governing applications for reinstatement. Mrs. West may not avoid these conditions with the mere assertion that she expected coverage to begin immediately because of a single sentence in the letter and application for reinstatement.

Moreover, the record of the previous correspondence from Lincoln Benefit to Mr. West regarding payment of overdue premiums demonstrates that it was unreasonable to expect that submission of payment and a completed application would result

28

in immediate reinstatement. When the Wests were late in paying their premium but still within the grace period, immediate payment was, in fact, all that was required for Mr. West's Policy to remain in effect. Each notice from Lincoln Benefit stated exactly that. The reinstatement letter was different, however. It was accompanied by an application with questions about Mr. West's health – something Lincoln Benefit had never before required to keep the Policy in force. Thus, simply by the nature of the transaction, the Wests were on notice that this time, there was at least one additional level of review that would take place before the Policy would be effective. Further, Mrs. West's testimony indicates that she did not believe that the application would be denied. This demonstrates an understanding that the application was something that Lincoln Benefit had the power to accept *or* deny, and not simply a ministerial exercise that effected reinstatement immediately.

In light of the totality of these circumstances, the evidence is clear and convincing: it was unreasonable for the Wests to expect the Policy to be in force at the time they mailed the overdue premium and application for reinstatement. Thus, even under the reasonable expectations analysis, Lincoln Benefit has no obligation to pay benefits on James West, Jr.'s lapsed policy of life insurance.

V.

For the foregoing reasons, we will affirm the order of the District Court.